UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------- x
                           :

**B.B.**, a minor, by his Next Friend Joy
Rosenthal; **T.R.**, a minor, by his Next Friend
Cynthia Godsoe; **M.P.**, a minor, by his Next
Friend Adira Hulkower; **Z.W. and D.W.**,
minors, by their Next Friend Jennifer Melnick;
**C.W.C.**, a minor, by her Next Friend Joy
Rosenthal; **J.R.**, a minor, by his Next Friend
Anna Roberts; **J.S. and S.S.**, minors, by their
Next Friend Lisa Hoyes; **C.P.**, a minor, by his
Next Friend Cynthia Godsoe; **C.C.**, a minor, by
her Next Friend, Lisa Hoyes; and **E.R., A.R.
and M.R.**, minors, by their Next Friend Peggy
Cooper Davis; on behalf of themselves and all
other similarly situated youth,

                         Plaintiffs,

               -against-

**KATHY HOCHUL**, in her official capacity as
Governor of the State of New York; **SHEILA
J. POOLE**, in her official capacity as
Commissioner of the New York State Office of
Children and Family Services; and **CITY OF
NEW YORK**,

                       Defendants.

-------------------------------------------------------- x

No.

**CLASS ACTION COMPLAINT**

## <u>INTRODUCTION</u>

1.      In 2020, the New York City Administration for Children's Services removed six

year old C.P. from the care of his mother. His uncle, with whom C.P. had always had a close

relationship and who was eager to maintain C.P.'s connections to his extended family during this

traumatic time, came forward and sought certification as a foster parent in order to care for C.P.

However, the Administration for Children's Services, in reliance upon a grossly deficient system

for evaluating family members as foster or adoptive parents, denied C.P.'s uncle certification as

a foster parent due to a prior misdemeanor conviction for Driving under the Influence. As a result, C.P. has been deprived of his uncle's loving home and continued connection to his family and is instead in foster care with a stranger.

2. C.P. is just one of the Named Plaintiffs in this civil rights class action brought by fourteen children involuntarily removed from their parents by New York City's child welfare agency (the "Named Plaintiffs"), challenging Defendants' unconstitutional laws, policies and practices that deprive them, and hundreds of similarly situated children, of foster care and adoptive placement with family members.

3. Defendants have created a certification system that unconstitutionally and routinely denies members of the Plaintiff Class (as defined below in paragraph 18) placement in familiar, safe and loving foster and adoptive homes of family members solely based on their relatives' past. These denials have grim consequences: children who could have been placed with family are thrust into stranger foster care or institutional group care, or are deprived of necessary services and support. This practice only serves to magnify the trauma of parental removal children experience in foster care and leaves children unnecessarily vulnerable.

4. Every year, the Administration for Children's Services removes thousands of New York City children from their parents or guardians pursuant to Article 10 of the Family Court Act due to allegations of abuse or neglect. These children are placed into the legal custody of the Administration for Children's Services, which contracts with 28 foster care provider agencies (collectively, "ACS"), and is overseen by New York State's Office of Children and Family Services ("OCFS"). A disproportionate number of these children come from homes of poor and marginalized families of color.

5.     Not surprisingly, children often experience being removed from their parents by ACS as traumatizing; they are removed from familiar surroundings and lose everything known and comforting for an indefinite period of time. For some, this loss is permanent, as many of these children grow up in foster care until they are too old to remain in care ("age out"). ACS may place children it removes in a shelter, a stranger's foster home, a group home or other congregate care setting, or in some circumstances, a relative's home.

6.     The ultimate goal of the foster care system, once it has removed children from their parents, is either to reunify children with their parents or, if that is not possible, to find a permanent home for the child. According to OCFS, "[t]he overarching goal for each child in [foster] care is to identify safe and suitable permanency options … within the context of safety and the child's best interests." Such permanency may be accomplished through return to parent, adoption or guardianship.

7.     In general, children are better able to cope with the massive disruption of removal from their homes when they are placed with a family member (a "Kin Caregiver"). The reason is obvious: a placement in a familiar, loving environment provides comfort and continuity at a time when these children are most vulnerable. Placement with a Kin Caregiver can minimize the trauma of removal and provide the child with a much-needed sense of security and comfort.

8.     As discussed below, social science data confirms that children placed with Kin Caregivers generally fare better than children placed with strangers. As reported in ACS's Interagency Foster Care Taskforce report, children placed with Kin Caregivers are better able to preserve community and family ties, have reduced trauma and higher rates of behavioral and emotional well-being, are more likely to achieve permanency though reunification, adoption or guardianship and are less likely to re-enter foster care.

9.      New York's child welfare system recognizes the value of placing children with Kin Caregivers. When ACS decides to remove a child from the home, the Social Services Law, Family Court Act and OCFS regulations require ACS to identify and notify relatives of the child's removal and consider their ability to care for the child. New York has also created programs designed to increase permanent care options for children with Kin Caregivers, such as the Kinship Guardianship Assistance Program ("KinGAP"), a subsidized guardianship program that aims to facilitate the permanent placement of foster children with Kin Caregivers.

10.     Despite the recognition that children removed from their parents generally do best when placed with a Kin Caregiver, only 42% of New York City children currently in foster care are in kin care placements.[1] That failure is due, in significant part, to three unconstitutional disqualification systems which deny children foster care and adoptive placements with Kin Caregivers based on their family member's past, rather than on their current ability to care for their relative children. These three disqualification systems, which encompass both provisions of NY Social Services Law § 378-a and the Defendants' regulations, policies and practices, are referred to collectively as the "Disqualification Systems."

11.     ***The Mandatory Disqualification System.*** New York Social Services Law § 378-a(2)(e)(1) deprives children in foster care of placement in a potential foster or adoptive home with a Kin Caregiver if the Kin Caregiver has a mandatory disqualifying conviction.  Rather than conduct an individualized assessment of whether the placement is safe, this law *mandates* the denial of the Kin Caregiver's application to be a child's foster or adoptive parent if the Kin Caregiver has ever been convicted of certain felony crimes. There are nearly <u>300</u> felonies in the New York Penal Law that require *lifetime* mandatory disqualification, including certain

---

[1] It is unclear how many of these placements are foster care placements as opposed to an unsupported direct placement, as described more fully below.

"attempted" felonies. There are approximately 40 other felonies that require a five year mandatory disqualification, including certain drug possession offenses. As a result, a child will be denied foster or adoptive placement with a Kin Caregiver even where a conviction mandating disqualification is decades old, even where the child has a loving, long term relationship with the Kin Caregiver, and even where the Kin Caregiver has been fully rehabilitated and maintains a safe home. The Kin Caregiver could be the mother of the president of the United States but nonetheless would be ineligible to serve as a foster or adoptive parent if she has a mandatorily disqualifying conviction.

12. ***The Discretionary Criminal History Disqualification System.*** Under New York Social Services Law § 378-a(2)(e)(3), a child may also be denied foster or adoptive placement with a Kin Caregiver if the criminal history record of the Kin Caregiver, or *any* household member over 18, reveals a *charge* (even if the charge resulted in no conviction) or a conviction for *any* crime at any point in the past. Both OCFS and ACS provide inadequate guidance and oversight to ensure ACS decision makers are appropriately evaluating and considering a child's Kin Caregiver who has a discretionary disqualifying conviction. As a result, ACS is routinely denying children foster care or adoptive placements with potential Kin Caregivers based upon the mere fact that the Kin Caregiver or adult household member has a criminal charge or conviction, without an individualized assessment of whether placement in a foster or adoptive home with the Kin Caregiver is safe. Compounding this violation, these children are then denied notice and an opportunity to challenge the denial of foster care or adoptive placement with their relative.

13. ***The SCR Disqualification System.*** Defendants may also deny a child placement with a Kin Caregiver if the kin or any household member over 18 was ever the subject of an

"indicated report" in the New York State Central Register of Child Abuse and Maltreatment (the "SCR"). The SCR is a registry of persons who have been investigated for child abuse or neglect. OCFS maintains the SCR, and SCR investigations are carried out by local district social services, such as ACS, acting under OCFS supervision. The standard for "indicating" a report is very low — "some credible evidence" is all that is required to indicate a report. And when ACS indicates a report, it is not required to take any action at all. The case may never be filed in Family Court and the family may never hear from ACS again. Thus, in and of itself, an indicated SCR record is not a reliable basis on which to determine that a Kin Caregiver actually committed child abuse or neglect, or that the Kin Caregiver's home is not safe for the child.

14. Both OCFS and ACS provide inadequate guidance and oversight to ensure that ACS is appropriately evaluating and considering a child's Kin Caregiver with an SCR record. As a result, Defendants are routinely denying children foster care or adoptive placements with potential Kin Caregivers based upon the mere fact that the Kin Caregiver or adult household member has an SCR record, without an individualized assessment of whether placement in a foster or adoptive home with the Kin Caregiver is safe. Compounding this violation, these children are then denied notice and an opportunity to challenge the denial of foster care or adoptive placement with their relative.

15. Once a child is denied foster care placement with a Kin Caregiver as a result of Defendants' Disqualification Systems, the child is at risk of being placed with a stranger or in a group care setting far away from their home community. The decision to place a child in stranger foster care can have a host of negative consequences for the child. Children who spend time in stranger foster care have poorer school performance and are more susceptible to homelessness, arrest, chemical dependency, and mental and physical illness than children who remain with their

families. Likewise, when a child is denied an adoptive placement with a Kin Caregiver, the child is at risk of being forever severed from their family through stranger adoption or "aging out" of the foster care system without achieving permanency.

16. The fact that Defendants' Disqualification Systems are not premised on actual determinations that the Kin Caregiver's home is unsafe or that placement with the Kin Caregiver is not in the best interest of the child is made apparent by ACS's practice of permitting many children to be placed with *disqualified* Kin Caregivers as a "direct placement." A direct placement is not a long-term option and requires the family to forgo the services and support that come with being a certified foster parent or adoptive parent (collectively, "Childcare Services and Supports").

17. Because the majority of children removed from their parents by ACS come from families who live at or near poverty level, a direct placement without Childcare Services and Supports deprives the child of many of the benefits that come with a certified foster home and puts their placement with a Kin Caregiver at risk of disruption.

18. The Named Plaintiffs bring this civil rights action on behalf of themselves and a putative class of all children in New York City who have been, or will be, removed from their parents by ACS pursuant to Article 10 of the Family Court Act, and who have been denied, or are at risk of being denied, a foster or adoptive placement with a Kin Caregiver based on the Kin Caregiver's or adult household member's criminal history record or SCR record (collectively, the "Plaintiff Class").

19. The actions and inactions of Defendants constitute a policy, pattern, custom and practice that are inconsistent with the exercise of accepted professional judgment and amount to deliberate indifference to the constitutionally protected liberty interests of the Plaintiff Class. As

a result, the Plaintiff Class has been, and are at risk of being, deprived of substantive due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution, including the right to family association and integrity, the right to be free from unnecessary intrusions into the child's emotional well-being, and the right not to be maintained in government custody longer than is necessary.

20.     The actions and inactions of Defendants also deprive the Plaintiff Class of their constitutionally protected liberty interests without offering the Plaintiff Class notice or an adequate opportunity to be heard. As a result, the Plaintiff Class has been, and is, at risk of being deprived of procedural due process rights conferred upon them by the Fourteenth Amendment to the United States Constitution.

21.     The Named Plaintiffs seek a declaration that Defendants' Disqualification Systems violate the constitutional rights of the Plaintiff Class, and seek class wide injunctive relief compelling the Defendants to remedy these unconstitutional practices.

## PARTIES

**THE NAMED PLAINTIFF CHILDREN**

**Named Plaintiff B.B.**

22.     ACS removed three month old B.B. from his mother's care in February 2018. Immediately after removal, B.B. was released to his maternal great grandparents, Mr. and Mrs. R., in Queens, Mr. and Mrs. R. B.B.'s mother lived with Mr. and Mrs. R. when B.B. was born but later left the house. When a finding of neglect was made against B.B.'s mother in September 2019, Mr. and Mrs. R. requested to be certified foster parents for B.B. When ACS asked Mrs. R. if she would be interested in becoming a foster parent, she replied "with all [my] heart."

23.     At 3 years old, B.B. has now gained weight and is growing appropriately. ACS reported that he is "happy and comfortable" with his great grandparents. He has bonded with Mr.

and Mrs. R. and they are "playful and affectionate" with each other. B.B. is "happy and alert" in Mr. and Mrs. R.'s care. According to ACS, Mr. and Mrs. R. continue to provide a "loving long term home for him."

24.     Mr. and Mrs. R. have been a big part of B.B.'s life since he was born, even saving his life once. When B.B. was two months old, his body went limp and his lips turned purple. Mr. and Mrs. R. performed lifesaving CPR and B.B. was brought to a hospital. He was diagnosed with chronic lung disease and asthma and remained hospitalized. In addition to the chronic lung disease, B.B. has also been diagnosed with Autism. He needs extra care and support and has an Individualized Education Plan to access services at school. B.B.'s family is a great resource given their experience dealing with B.B.'s uncle, who also has Autism. The family is patient and constantly engages with B.B. Mr. and Mrs. R even help him with his online learning. While B.B. does not speak yet, he has learned some sign language in order to communicate with his family.

25.     Mr. and Mrs. R. live close to B.B.'s family and friends. B.B. is able to visit regularly with his Aunt and his cousins. B.B. also spends a lot of time with his teenage uncle who also lives with him.  B.B. loves to play with his uncle, doing puzzles together or having his uncle read to him.

26.     Despite a finding of neglect against B.B.'s mom and Mr. and Mrs. R.'s eagerness to be certified foster parents, ACS did not take action to certify the home until December 2019 after urging from B.B's attorney. After being placed with his great grandparents for nearly two years, ACS started the process of certification.

27.     In April 2020, ACS informed Mr. and Mrs. R that due to a 25 year old conviction they could not be foster parents for B.B. ACS informed the family that B.B would be removed

from the home in June 2020 despite, as ACS stated, the family meeting all of B.B.'s "medical, emotional, and physical needs."

28.     In 1995, Mr. R. was convicted of Attempted Burglary 2nd degree, a mandatory disqualifying offense. Mr. R's offense was a youthful aberration in an otherwise overwhelmingly law-abiding life. Since 1995, Mr. R. has successfully raised five children of his own and has had no further criminal history.

29.     Prior to the law mandating disqualification for certain convictions, Mr. and Mrs. R. successfully adopted two of their grandchildren. Now they cannot be a foster parent for their great grandchild, and B.B. must pay the consequences for a mistake his great grandfather made almost three decades ago.

30.     When the family was told about the denial, there were "a lot of tears." Mr. and Mrs. R had worked hard to provide a loving home for B.B. Mrs. R. had even lost significant weight so that she would be physically able to care for the toddler. If B.B. was removed from their home, he would be placed into stranger foster care and lose his daily connection with his loving family. A move from his great grandparents' home would only put B.B. at risk of further trauma from the family separation.

31.     Because of Mr. R.'s mandatory disqualifying conviction, there is no process for B.B. or his Kin Caregivers to challenge ACS's decision to deny foster parent certification. Effectively acknowledging that placement with Mr. and Mrs. R was both safe and best for B.B., ACS decided to directly place B.B. with his great grandparents. However, in doing so, ACS has denied B.B. and Mr. and Mrs. R. the Childcare Services and Supports they so desperately need.

32.     B.B. requires a lot of support. He is low functioning and non-verbal. At times, he self-harms and can be aggressive. As a result, Mrs. R frequently relaxes B.B. with a massager.

She also administers the many medications B.B. takes for his chronic lung disease and takes B.B. to all his doctors' appointments.

33. The COVID-19 pandemic has been particularly hard on the family. B.B. has had to attend pre-school remotely half the time. Remote pre-school is particularly challenging given B.B.'s special needs. Mr. and Mrs. R. do everything they can to support B.B.'s online learning. The family even rearranged the living room by turning half of it into a classroom with a table and chairs. Mrs. R. saved some school supplies from her children that B.B. is able to use.

34. The family has lost seven close family members and friends due to the COVID-19 pandemic, which Mrs. R said has been "very hard." Mr. and Mrs. R. have tried to remain strong for B.B. during this difficult time, but the significant loss and financial strain has taken a toll on the family.

35. Moreover, Mr. R. has end stage renal failure and is on dialysis. He has had to have surgeries to address his condition. During one of his last surgeries, Mr. R. went into a coma and was on life support for 3 days, leaving the family worried, and Mrs. R unable to sleep for 3 days.

36. Despite their hardship, Mr. and Mrs. R would love to provide further stability and express their love for B.B. through adoption. However, based on the statute, Mr. and Mrs. R. are not eligible to be approved as adoptive parents due to the same mandatory disqualifying conviction that barred them from foster parent certification.

37. The family desperately needs Childcare Support and Services. The family is on a fixed income and at times has been short on their monthly bills. If B.B. was placed with Mr. and Mrs. R as a certified foster home, the family would likely receive increased foster care maintenance payments due to B.B.'s heightened needs. Although the family wants to stay

together, without foster care funding and services, it is increasingly difficult to manage the needs of B.B.

38.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff B.B. appears by his next friend, Joy Rosenthal. Ms. Rosenthal is familiar with the issues regarding B.B.'s time under ACS custody and supervision. Ms. Rosenthal is an Adjunct Professor at City University of New York School of Law and has represented children and families in New York City for over twenty years. Ms. Rosenthal is well suited to represent B.B.'s best interests in this case.

**Named Plaintiff T.R.**

39.     T.R. entered foster care in January 2021, when he was 10 months old. After being removed from his biological parents in Harlem, T.R. was placed in a youth reception center for four days, and was then moved to a stranger foster home.

40.     At the time of his removal, T.R.'s biological mother suggested T.R.'s maternal grandmother and uncle, Ms. K. and Mr. K., who reside together in Ms. K.'s home, as resources for T.R. Mr. K.'s 3-year-old son, who is in Mr. K's sole custody, also resides in the home.

41.     Ms. K. immediately expressed eagerness to care for T.R., just as she had previously done for three of her other grandchildren – T.R.'s half siblings, J.K., J.K., and M.S. As a devoted grandmother, Ms. K. has desperately wanted to avoid seeing her grandchildren placed in stranger foster care. In June 2017, ACS placed T.R.'s three half siblings with Ms. K. until February, 2018, when they were ultimately released to their biological father. The children reportedly adjusted well to Ms. K.'s home and were well-cared for throughout. ACS reported no safety concerns for the children while they were living with Ms. K.

42.     Despite her similar desire to care for T.R., in January 2021, ACS reported that they would not certify Ms. K. as foster parent for T.R. due to her past SCR history, and three Domestic Incident Reports ("DIR"). Ms. K.'s only indicated SCR case is from twenty years ago. This 2001 SCR incident did not result in any Family Court filing, nor was Ms. K. referred for services based on the allegations. Similarly, the three DIRs were related to Ms. K. calling the police due to difficulties ensuring that her son Mr. K. (then a teenager) attended school and followed her rules. The DIRs were for verbal altercations only, and did not result in any ACS involvement. Since that time, Ms. K. has successfully raised three children and helped raise seven grandchildren. Mr. K. is now 27 years old, and there is no evidence of any domestic incidents in the home since he became an adult. Likewise, there is no evidence that suggests Ms. K. would not provide a safe home for infant T.R. today.[2]

43.     Although it is in ACS's discretion to certify the home of Ms. K., it refused to continue with a full home study and evaluation of Ms. K.'s home once it learned of the SCR history. Moreover, ACS refused to provide Ms. K. with written notice officially denying foster care certification. ACS stated that because it was conducting a temporary emergency evaluation, written notice was not required. Simultaneously, ACS refused to refer Ms. K. for the full foster parent certification process. As such, T.R. was left without a meaningful assessment of Ms. K.'s ability to care for him and, he was deprived of any written notice of the denial. There is no process for T.R. to challenge ACS's decision.

44.     Rather than being placed in a certified kin foster home, T.R. was directly placed with Ms. K. As a result, Ms. K. will continue to care for and support T.R. without being a

---

[2] ACS also reported that they opposed placement due to a 2018 arrest of Mr. K. The Legal Aid Society ran a criminal background check for Mr. K. that yielded no criminal charges from any 2018 arrest. After being informed of the results of the criminal background check, ACS did not pursue that argument in their opposition to placement with Ms. K. Moreover, an arrest alone would not qualify as a mandatory disqualifier regardless of the arrest charge.

certified foster parent and without any of the critical Childcare Supports and Services for T.R. The Family Court noted that ACS's opposition rested uniquely on the fact that Ms. K. had an indicated case twenty years ago, for which no case was ever filed or brought to court, and a few DIRs. The Court concluded that the "current ACS investigation has revealed nothing else and has not demonstrated in any other manner that the grandmother's home is not suitable. In fact, it is of no little import that Ms. K.[] was a successful placement resource for the subject child's sibling(s)."

45. Although Ms. K. understands the demands of caring for an infant, the family struggles without the Childcare Supports and Services. ACS has not provided Ms. K. with T.R.'s basic documents, including his birth certificate, to assist in enrollment in needed programs. Ms. K. also cannot participate in training and services for foster parents that would provide helpful guidance and community in caring for a young child.

46. The family is also struggling financially. Ms. K. worked in New York City for many years to support her extended family, including in a nursing home and a daycare setting. The two adults and two children live in a small apartment, and Ms. K. has requested assistance from ACS multiple times to obtain more suitable furniture, educational toys and housing. Ms. K. often forgoes her own needs to help provide for her family, but must rely on financial support from relatives, or the scarce visits from ACS, to supply her with diapers for T.R. It was recently recommended that T.R. receive physical therapy to help improve his delayed gross motor skills, which impact his balance, increasing the demands on Ms. K.

47. Living with his grandmother, uncle and cousin provides T.R. with the love, support, and stability that is critical for a young baby. T.R. and his cousin are very close, and enjoy playing together. They love to wrestle with each other and chase each other throughout

Ms. K.'s home. Although T.R. was not meeting developmental milestones when he first came to live with Ms. K., he is now thriving in Ms. K.'s care—he has started to talk, walk freely, is learning the alphabet, and loves to listen to music and dance. Ms. K. takes T.R. to his medical appointments and supports his emotional and developmental needs. T.R. has recently started to call Ms. K. "Nana." Ms. K.'s ongoing relationship with T.R.'s half siblings allows T.R. the chance to develop substantial connections with his biological family. She regularly arranges for T.R. to have visits with his half-siblings, and is planning to introduce T.R. to his newborn cousin soon.

48. Ms. K. has received inconsistent updates on the status of T.R.'s case from ACS, and the family lives in fear that T.R. is going to be removed from her care at any time.

49. Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff T.R. appears by his next friend, Cynthia Godsoe. Ms. Godsoe is familiar with the issues regarding T.R.'s experience under ACS custody and supervision and is well suited to represent T.R.'s best interests in this case. Ms. Godsoe is a Professor of Law at Brooklyn Law School where she teaches courses on Family Law and Children and the Law. She also represented children for several years in New York City's Family Court.

**Named Plaintiff M.P.**

50. In December 2018, ACS removed then fourteen-year old M.P. from his father's care in Brooklyn and placed him in the care and custody of ACS. M.P.'s mother was deceased at the time.

51. Upon removal, ACS placed M.P. with Ms. M., his father's cousin. Ms. M. had been a resource and support for M.P. since before ACS removed him from his father's care. Ms.

M. served as a foster parent for several children for over a decade up until 2009 when her home closed. As such Ms. M. understands the demands of caring for children in ACS custody.

52.     In February 2019, ACS placed M.P. at Geller House, a Rapid Intervention Center, for assessment. ACS then moved M.P. to Children's Village, a Residential Treatment Center (RTC), in May 2019. The RTC is a congregate care facility in Westchester.  M.P. felt depressed, disconnected from his community and unsafe at the RTC and after ten days left the facility and went to Ms. M.'s home. Ms. M. then sought to proceed with foster parent certification so that she would be able to provide longer term care for M.P.

53.     Ms. M. was able to provide a loving, stable, and caring environment for M.P, with Ms. M. reporting no issues and an improving relationship.  M.P. requires special support such as mental health care to help address some impulsive behavior.  Ms. M. not only enrolled M.P. in school but also helped M.P. meet his mental health and medical needs, including ensuring M.P. had a mental health provider in his community. In addition, the family began to engage in family therapy.  M.P.'s father also expressed that he wanted M.P. to be under the care of Ms. M.

54.     M.P.'s behavior improved under the care of Ms. M.  M.P. expressed a desire to perform better in school, with Ms. M. encouraging M.P. to strive to graduate on time.  Under Ms. M.'s supervision, M.P completed chores and helped around the house, such as cleaning his room or doing laundry. M.P. and Ms. M. also enjoyed making dinner together.

55.     However, over eight months later, in January 2020, ACS still would not certify Ms. M. as a foster parent for M.P. due to a single SCR record for "Inadequate Guardianship" from over a decade earlier. The SCR record was from Ms. M.'s service as a foster parent. Her home was closed as a foster placement with ACS in 2009. ACS did not provide further details about the SCR record and the closure of Ms. M.'s home ten years earlier.

56. Instead of providing M.P. with the Childcare Supports and Services that come with being in a certified foster home, ACS continued M.P.'s placement with Ms. M. as an "extended visit." ACS never provided M.P. with notice officially denying foster care placement with Ms. M. Moreover, there is no process for M.P. to challenge ACS's decision.

57. Even after ACS denied M.P. foster care placement with Ms. M., ACS reported that Ms. M. was a "great support system" for M.P. She reportedly provides "structure and guidance" and is helping M.P. "adhere to boundaries and limits in the home." ACS reported "no issue[s]" since M.P. was with Ms. M. Moreover, while with Ms. M., M.P. was able to maintain connection to his family and to his community.

58. In the fall of 2020, Ms. M. began to really struggle to continue to care for M.P. Ms. M. was unable to work due to an injury, and without the Childcare Supports and Services that come with a foster care placement, some of M.P.'s behavioral needs became difficult to manage. ACS removed M.P. from Ms. M.'s home in December 2020 and placed him back at the RTC where he had felt unsafe.

59. M.P. remains at the RTC in Westchester, far away from his home community. Placement in institutional care makes M.P. more susceptible to poor school performance, homelessness, arrest, and aging out of ACS custody without a permanent home.

60. Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff M.P. appears by his next friend, Adira Hulkower. Ms. Hulkower is familiar with the issues regarding M.P.'s time under ACS custody and supervision. Ms. Hulkower is a bioethics consultant in a major New York City health system. She previously represented children in New York City Family Court for over a decade. Ms. Hulkower is well suited to represent M.P.'s best interests in this case.

**Named Plaintiffs Z.W. and D.W.**

61.     In August, 2019, Z.W., then 1 year old and D.W., then 3 months old, were removed from their parents in the Bronx by ACS. ACS directly placed them with their maternal uncle, Mr. P., and his partner, Ms. G. Having been with their aunt and uncle since they were babies, Mr. P.'s home is essentially the only one Z.W. and D.W. have ever known.

62.     Mr. P. and Ms. G. provide a safe and loving home for Z.W. and D.W. and the children are thriving in their care. Z.W. is a smart, happy, and energetic child who loves to practice counting and the ABCs. D.W. loves interactive board games, building with blocks, and playing with tennis balls.

63.     Mr. P. and Ms. G. do not want the children to end up in stranger foster care. They have extended family around the home often, and arrange for Z.W. and D.W. to visit with their siblings nearly every week. Growing up with family around provides Z.W. and D.W. with the stability and support that is critical for young children's development.

64.     When ACS placed the children with Mr. P., he immediately sought foster parent certification for Z.W. and D.W., but has repeatedly been told that he is unable to be certified due to a case pending since May 2019 in which he is accused of Driving Under the Influence (DUI). The case remained open for over two years due to pandemic related delays. No other charges were ever filed in connection with the arrest. Because the charge does not implicate a mandatory disqualifying conviction, ACS is not required to hold his foster parent application in abeyance.

65.     Despite their ability to use their discretion and certify Mr. P., ACS refuses to evaluate Mr. P. as foster parent for Z.W. or D.W. or even allow him to proceed with a full application. Mr. P.'s criminal case has since been resolved, and yet ACS continues to tell Mr. P. he cannot be a foster parent for his niece and nephew. At the same time, ACS has refused to

provide written notice officially denying foster care certification to the children or their uncle. There is no process for D.W. or Z.W. to challenge ACS's decision.

66.     By permitting Z.W. and D.W. to remain directly placed in Mr. P's care for more than two years, ACS has effectively acknowledged that this placement is consistent with Z.W. and D.W.'s best interests.  It has reported that there are "no safety factors" with the home, yet simultaneously denies Mr. P. foster care funding, training and services to care for the children. ACS reported that the children are "bonded and comfortable" with their uncle and his partner.

67.     Z.W. and D.W. have two siblings who were also removed by ACS at the same time and who expressed interest in living with their uncle.  Having the opportunity to live with their two additional siblings together would have been good for Z.W. and D.W. and their siblings. However, without foster parent certification Mr. P. is unable to care for all four children.

68.     Although Mr. P. and Ms. G. are devoted to caring for Z.W. and D.W., they were not expecting to have two young babies at this point in their lives.  Without the assistance of Childcare Services and Supports that comes with foster parent certification, the family is struggling. Mr. P. has four boys of his own—two of whom, ages 16 and 10, still live with the family. Z.W. was enrolled in daycare 5 days per week, but that has stopped since the daycare permanently closed. Increasing the demands on the family, D.W. was diagnosed with autism in March 2021, and he receives daily therapy in person, and speech therapy twice per week. D.W. is non-verbal and exhibits some challenging behaviors.

69.     The financial stress of caring for two young children, especially during the pandemic, has also taken a toll on the couple. Mr. P. recently lost his job as a personal trainer at a gym because of its closure. Ms. G. works as a housekeeper at a hospital, which is a hard and

stressful job, and provides limited financial resources. Further, Mr. P. is unable to get Z.W. and D.W. included on his public assistance budget, because they remain on their mother's budget. Besides providing a bed for Z.W. and a few daycare vouchers, ACS has not offered any support to the family. If ACS had certified the home, the family may have been eligible for increased foster care funding due to D.W.'s increased needs.

70.     Z.W. and D.W.'s mother recently had a baby, who is at risk of being removed due to the ongoing child welfare concerns surrounding the mother's mental health and substance abuse issues. Mr. P. has expressed that although he would be willing to care for the newborn to avoid placement into stranger foster care, without the Childcare Services and Supports that comes from foster care certification, the family will not be able to care for the additional child.

71.     The children's direct placement with their uncle is not a permanent option for them due to the temporary status of a direct placement and the lack of Childcare Supports and Services. The family is unable to plan for the future and Z.W. and D.W. continually worry about whether they will be able to remain with their uncle. As the children grow and D.W.'s needs increase, the strain on the family only deepens.

72.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedures, Named Plaintiffs Z.W. and D.W. appear by their next friend, Jennifer Melnick. Ms. Melnick is a clinical social worker and therapist who has worked with children and adults for over twenty years. In addition, she provides assessments and service recommendations for children involved in the child welfare system. Ms. Melnick is familiar with the issues regarding Z.W. and D.W.'s experience under ACS custody and supervision, and is well suited to represent their best interests in the case.

**Named Plaintiff C.W.C.**

73.     In August 2020, ACS removed 3 year-old, C.W.C. from her mother's care in the Bronx. Immediately, C.W.C. was placed with her maternal grandmother, Mrs. G. and has been in her care since.

74.     Mrs. G. has been a positive presence in C.W.C.'s life since C.W.C was born, often watching and caring for her when her parents were unable. Prior to her removal from her mother, C.W.C. and her mother lived with Mrs. G.

75.     According to ACS, C.W.C. is thriving with Mrs. G. She has a "variety of educational toys" in the home. C.W.C. loves music and often sings along to her favorite songs. C.W.C. lives with Mrs. G., Mrs. G's husband, her aunt (Mrs. G's daughter), and her aunt's children, ages 12 and 20 months. ACS reported that C.W.C. "interacts appropriately [sic] with family members in the home." Her cousins are like siblings to C.W.C. She and the 20 month-old are very close and watch cartoons together every morning before school.

76.     According to an August 2021 ACS Report, there are no safety concerns regarding C.W.C.'s placement with Mrs. G. Her daycare reports that C.W.C. is playful, makes friends, and is using the toilet appropriately.

77.     In addition to being a mother herself, Mrs. G. was a certified foster parent for over 30 years caring for dozens of children and adopting three children. Mrs. G. has been a caretaker for the majority of her life. Yet despite her extensive experience and ability to care for C.W.C., ACS refused to certify Mrs. G. as a foster parent for C.W.C.

78.     ACS reported that Mrs. G. could not be certified due to an incident that occurred in her home over five years earlier while she was serving as a foster parent. ACS conducted an

investigation when a child was injured in the home, allegedly due to one young child hitting another with a toy. The investigation was unfounded but Mrs. G.'s home was closed.

79.     At the time, Mrs. G. was not informed her home was closed. It was not until she was told she could not be a kin foster parent for C.W.C. that she realized something was wrong. Immediately, Mrs. G. contacted OCFS and received a letter on March 5, 2021 stating that the investigation was unfounded. She sent this letter to ACS, but was told they would not overrule the initial decision. Mrs. G. also wrote to the ACS Commissioner and Assistant Commissioner in May 2021 but received no response. In October of 2021, ACS reported that that it had "attempted to have [Mrs. G's] previous foster care determination overturned however [ACS's] efforts were unsuccessful." ACS did not provide C.W.C. or Mrs. G. with a formal notice of denial of certification. C.W.C. has no recourse to challenge the denial of her foster care placement with Mrs. G.

80.     C.W.C.'s placement was changed to a direct placement. Mrs. G. continues to fight to have her home reopened. In the meantime, C.W.C. resides in her home without much needed Childcare Supports and Services.

81.     Mrs. G. takes care of C.W.C. with the help of her husband, her daughter, and C.W.C.'s godmother. The family provides a loving and familiar home for C.W.C., who enjoys walks with her grandmother and participates in religious services with her family. C.W.C. does not receive any assistance from ACS. Moreover, ACS reported that Mrs. G. tried to apply for food stamps for C.W.C. but was denied because C.W.C's mother was already receiving benefits for her. Mrs. G. is on a fixed income, receiving social security and disability benefits and has made many sacrifices to care for C.W.C. The family worries every day that C.W.C. will be removed from their care.

82.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named
Plaintiff C.W.C. appears by her next friend, Joy Rosenthal. Ms. Rosenthal is familiar with the
issues regarding C.W.C.'s time under ACS custody and supervision. Ms. Rosenthal is an Adjunct
Professor at City University of New York School of Law and has represented children and
families in New York City for over twenty years. Ms. Rosenthal is well suited to represent
C.W.C.'s best interests in this case.

**Named Plaintiff J.R.**

83.     In August 2017, when J.R. was seven years old, ACS removed J.R. from his
father in Brooklyn and took him into ACS custody. ACS initially placed J.R. at a large shelter in
Manhattan until moving him to a stranger foster home.

84.     The removal was particularly traumatic for J.R. who only 10 months earlier had
lost his mother. He was still trying to process her death when he was placed into stranger foster
care.

85.     Since his initial placement, J.R. has moved in and out of different homes at least
six times while under the supervision of ACS. As a result, he has been forced to change schools
several times, interrupting his education and putting his grade promotions at risk. Moreover, J.R.
has had an Individuated Education Plan (IEP), a written plan that specifies a child's special
education and related service needs, since at least 2019. His IEP requires additional services to
address his disabilities and increased learning needs. Changing schools has only made it more
difficult to ensure J.R. has an appropriate educational plan so he can make progress toward his
academic goals.

86.     In December 2019, ACS placed J.R. with his paternal grandmother, Ms. V., and
her husband. Ms. V. stepped up to care for J.R. and provide a safe and loving home for him. J.R.

had previously lived with Ms. V for three months until a medical issue temporarily prevented her from caring for him. Once better, Ms. V. sought foster parent certification in order to care for J.R.

87. J.R. really enjoyed living with his grandparents. He felt connected with his extended family and safe and secure with his grandmother. J.R. enjoyed going to school while living with Ms. V. ACS reported that he was "happy" in his grandmother's home and things were going "smoothly and well." ACS also started the process of withdrawing their petition to terminate J.R.'s father's parental rights because ACS was working toward KinGAP with Ms. V. as J.R.'s permanency plan.

88. However, just two months after being placed in Ms. V.'s home, ACS removed J.R. and once again placed him in a stranger foster home. ACS denied foster parent certification after a background check revealed Ms. V.'s husband had an almost thirty year old conviction for robbery in the 2nd degree, a mandatory disqualifying conviction. The news was devastating to J.R. Despite the age of the conviction and the fact that J.R. was thriving in the grandmother's home, ACS removed J.R., subjecting him to another traumatic move.

89. ACS never provided J.R. with notice officially denying foster care placement with his grandmother. Moreover, there is no process for J.R. to challenge ACS's decision. As a result of the move, J.R. was again placed in a new school.

90. Throughout his foster placements, J.R. has continued to request sibling visits with his half-siblings and step-siblings. However, it has often been difficult to coordinate visits with his brother and sisters, some of whom are his age and thus close allies—13- and 12-year-old step-siblings, and a 9-year old half-sibling—as well as a younger half-sibling who is now 4. His

longest-term placement was in the Bronx while most of his family lives in Brooklyn. This separation only served to magnify the trauma of his removal from his father and grandmother.

91.     J.R. has been diagnosed with mental health issues on multiple occasions during his time in foster care. He was diagnosed three times – in September of 2017, June of 2017 and April of 2019 – each time with at least one new diagnosis. He has been found to have eight different diagnoses, including Attention Deficit Hyperactivity Disorder (ADHD), major Depressive Disorder, Disruptive Mood Dysregulation Disorder, Complex Bereavement Disorder, Posttraumatic Stress Disorder, Neglect and associated Victim of Neglect and Abuse, and Language Disorder. He has received mental health and therapy services off and on since entering foster care.

92.     Again in January 2021 J.R. was moved from a stranger foster home in the Bronx to a new stranger foster home in Harlem. Without any permanency, J.R. lacks stability and continues to be moved from home to home. These disruptions are difficult and unsettling for J.R. and reduce the likelihood of finding a permanent, loving home. J.R. once again will transfer in the middle of his 5th grade year to a new school with all new children and teachers. His IEP services will be disrupted with the change of school and J.R. will once again need to advocate for additional supports to keep up in the classroom.

93.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff J.R. appears by his next friend, Anna Roberts. Ms. Roberts is a law professor who is familiar with the issues regarding J.R.'s time under ACS custody and supervision. Ms. Roberts is an expert in criminal law and the racial biases inherent in the criminal legal system. She is well suited to represent J.R.'s best interests in this case.

**Named Plaintiffs J.S. and S.S.**

94.     In March 2018, ACS removed J.S. from his parents in Queens and took him into ACS custody. He was fourteen months old at the time. Fortunately, ACS immediately placed J.S. with a relative he has known his whole life – his maternal grandmother, Ms. S. When his younger sister S.S. was born in April 2018, ACS immediately took her into its custody and also placed her with her grandmother, Ms. S.

95.     Both children have found a stable and loving home with their grandmother. Ms. S. enrolled J.S. and S.S. in daycare and she takes both children to their regular medical appointments. Ms. S. also makes sure that the children stay connected with their extended family and often has relatives over to the home. It is obvious that J.S. and S.S. adore their grandmother. For S.S. especially, Ms. S.'s home is the only home she has ever known. S.S. is now 3 years old and has started calling Ms. S. "mama."

96.     Despite the stability and safety both children have found living with Ms. S. – and despite Ms. S.'s eagerness to be certified as a foster parent for J.S. and S.S.– ACS informed Ms. S. that she could not be certified as a foster parent. Instead in April 2018, ACS "directly placed" the children with Ms. S. However, it wasn't until June 17, 2019 – over a year after placing J.S. and S.S. with their grandmother and after a threat of contempt of court, that ACS issued a letter laying out the basis for the denial of foster parent certification. This letter stated that Ms. S. could not be certified as a foster parent for the children due to her SCR and criminal history, but failed to provide any information about what, if any, recourse there was for the family.

97.     Notably, most of this SCR and criminal history is decades old, dating from the 1980s and early 1990s when Ms. S. suffered from substance abuse. Ms. S. has been clean for over 25 years and these stale reports have no bearing on her ability to provide a safe and loving

home for both J.S. and S.S. now. More recently, Ms. S. has struggled with her daughter – J.S. and S.S.'s mother – due to her daughter's mental illness. A few Domestic Incident Reports and one arrest resulted from altercations as she struggled to raise her young adult daughter several years before her grandchildren were placed in her home.

98.     Due to Ms. S.'s history, ACS refused to certify her as a foster parent for J.S. and S.S. For this reason, the family remains ineligible for Childcare Services and Supports that come with foster parent certification, despite the care she provides. ACS never provided Ms. S. with the required notice officially denying foster care certification for J.S. and S.S., nor did they provide any notification to J.S. or S.S. Moreover, there is no process for the children to challenge ACS's decision.

99.     Despite its refusal to certify Ms. S., ACS nevertheless recognized that there were no actual safety concerns with placing J.S. and S.S. in Ms. S.'s care and therefore opted to "directly place" the children in her care. This means that Ms. S. continues to care for and support the children without being a certified foster parent and – crucially – without any Childcare Services and Supports. ACS continues to report that the children are doing "exceptionally well" in the care of their grandmother.

100.    ACS's denial of foster parent certification has put significant financial stress on the family. Until recently, Ms. S. was also caring for her late sister who was an amputee and lived with Ms. S. As many loving grandmothers would, Ms. S. deprives herself in order to provide for her grandchildren. Sadly, even these sacrifices are not enough. The family has not had enough money to provide a Thanksgiving meal and the children's attorney provides second hand clothes for J.S. and S.S. The minimal public assistance the family receives does not even

cover the cost of diapers and other necessities. Ms. S. is worried that she will never be able to retire if she must care for the children without any support or services from ACS.

101.    Adding to these struggles, J.S. was diagnosed with Autism Spectrum Disorder. As his needs increase, so do the demands on the household. The children struggle without a foster care case planner, medical services and other resources ACS provides children in foster care. If J.S. were in the certified foster home of Ms. S., he might have been eligible for increased foster care maintenance rate due to his increased needs. On her own Ms. S. "has done everything needed to have [J.S.] evaluated and have him in the correct setting in school where he is receiving the necessary services" but because of his aggressive and overactive behavior, J.S. is struggling to stay in pre-school. J.S. and S.S. worry about being removed from their grandmother – a change that would cause them trauma and emotional stress. Ms. S. wants to provide a permanent home for the children but – because of her denial as foster parent – she is not eligible for KinGAP and she will face the same barriers to adoption as she did to foster parent certification.

102.    Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs J.S. and S.S. appear by their next friend, Lisa Hoyes. Ms. Hoyes is an Assistant Dean at New York University School of Law. She previously represented young people in civil, criminal and family court. Ms. Hoyes is familiar with the issues regarding J.S's and S.S.'s experience under ACS custody and supervision and is well suited to represent J.S's and S.S.'s best interests in this case.

**Named Plaintiff C.P.**

103.    Six year old C.P. and his three younger siblings were removed from their mother in the Bronx and taken into ACS custody in October 2020. After his removal, C.P.'s uncle, Mr.

P, immediately offered to become a foster parent for C.P. so that he could avoid stranger foster care. However, ACS refused to certify Mr. P. as foster parent because he had a prior misdemeanor conviction. As a result, C.P. is now in a stranger foster home away from his family.

104.    C.P. has always been close with his uncle. Mr. P. often watched and cared for C.P. and his siblings. Most notably, during the pandemic shut down, Mr. P. helped care for all four children, often overnight. C.P. adores Mr. P. and affectionately calls him by the single name "Uncle." Mr. P also lives close to Mr. P.'s sister. If C.P. lived with Mr. P. he would be able to see his aunt and cousins often. Before C.P. was taken into ACS custody, his aunt cared for him and one of his younger brothers about twice a month. Together the family would go to the park, watch movies, and sometimes have sleepovers.

105.    After C.P. and his three younger siblings were removed from their mother, they were all placed at the Children's Center, a large shelter in Manhattan. Immediately after removal, C.P. asked to be placed with Mr. P, who readily agreed to be a foster care placement for C.P. He knew he could provide a loving home for at least one of his nephews. ACS visited his home and discussed certification. An ACS caseworker informed Mr. P. that he was cleared for certification. Mr. P. began preparing for C.P. by speaking with his landlord about possibly renting more space for the two of them as well as coordinating with other family members for the care of C.P.'s siblings.

106.    However, after two weeks of languishing in congregate care, ACS refused to place C.P. with Mr. P. An ACS caseworker stated that ACS would not certify Mr. P. due to a 2017 misdemeanor conviction for Driving Under the Influence, a conviction not included on the mandatory exclusion list. Rather than using its discretion to certify Mr. P. for the care of C.P.,

ACS summarily denied him based on the conviction. Although Mr. P. was willing to abide by an order not to drive with C.P. if he was placed in his care, ACS reported that Mr. P. has a "conviction for operating a motor vehicle while under the influence of alcohol or drugs, a misdemeanor" and therefore it "has chosen to deny Mr. [P.]'s application to be a foster parent, which it has discretion to do."

107.    At the time of Mr. P's conviction, he was living upstate, working and going to school. The incident did not involve a child, no one was injured, and there was no damage to any vehicle. Mr. P. regrets the acts that led to the conviction and has since tried very hard to make amends for the incident, including enrolling in an Impaired Driving Program.

108.    ACS did not provide any written notice of the denial of certification to Mr. P. C.P. also did not receive any notice denying him foster care placement with his uncle. Nor did ACS provide any opportunity to discuss or appeal the denial of Mr. P.'s foster parent certification.

109.    In addition to Mr. P., other relative resources offered to care for C.P.'s siblings but they, too, were denied certification. The siblings' aunt was denied due to concerns that her living space was inadequate. Another relative resource was denied as a foster parent for the siblings – even though she is already certified as a foster parent for other children – because the youngest sibling has special needs and her foster care agency does not provide certification for the level of care the two younger siblings require.

110.    As a result, after three weeks in the large Manhattan shelter, C.P. and his three younger siblings were moved into two separate stranger foster homes. Rather than being placed in a familiar, loving home with a family member he knows and trusts, C.P. is now living in a strange new home in the Bronx. Although C.P was initially placed in the foster home with his sister and one of his younger brothers, his brother has since been moved to his brother's

biological father's home. C.P. continues to be separated from his other younger brother and family members. Once placed in a stranger foster home, C.P. regressed significantly – needing diapers, even though he has long been potty-trained, and wetting the bed. He also has difficulty sleeping because he has become afraid of the dark. Recently, it was identified that C.P. needs additional educational support and was referred for individual therapy.

111. Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff C.P. appears by his next friend, Cynthia Godsoe. Ms. Godsoe is familiar with the issues regarding C.P.'s experience under ACS custody and supervision and is well suited to represent C.P.'s best interests in this case. Ms. Godsoe is a Professor of Law at Brooklyn Law School where she teaches courses on Family Law and Children and the Law. She also represented children for several years in New York City's Family Court.

**Named Plaintiff C.C.**

112. C.C. was removed from her mother's home in the Bronx in October 2020 at age 12. At that time, she was placed with her step-father with whom she lived until June 2021 when he could no longer care for her. ACS was considering placing C.C. in a congregate facility, but fortunately, C.C.'s aunt and uncle stepped up to care for her at this critical time.

113. Prior to residing with her aunt and uncle, C.C. was struggling with online school and was in jeopardy of repeating 8th grade. She frequently missed classes and was failing many of them. Upon placement with her aunt and uncle, C.C. completely turned her academic progress around. Not only did C.C.'s attendance and grades improve, but so did her overall morale: C.C. is going to be the next president of her class. Recently, a teacher called from school to let the family know how well C.C. was doing in school.

114.    At the same time, ACS reported that C.C. was "happy with the placement" with her aunt and uncle. C.C. has also become very close with her cousin who also lives in the home. The two act like sisters and C.C.'s aunt treats them as such. If her aunt buys something for her daughter, she buys the same thing for C.C.

115.    C.C.'s aunt ensures that C.C. is able to stay connected with other members of her family – C.C. speaks to her father on the phone every day and frequently visits extended family, including her grandmother and other aunt. C.C. has also become so close with her aunt that she is now calling her "mom." This is important because as a court ordered evaluation stated, C.C. "struggles with trust" after "experiences of abandonment, betrayal and inconsistent parenting expectations and responses." C.C. has experienced "significant trauma exposure including physical abuse and [her] mother's ensuing arrest, witnessing domestic violence, observing community violence, bullying in school, and several violent and non-violent deaths."

116.    Despite C.C.'s progress in the care of her aunt and uncle, ACS denied them foster parent certification. Although no written notice of the foster care denial was provided to C.C. or her aunt and uncle, an ACS caseworker reported that the denial was based on a 1996 drug related conviction and an SCR record from a decade earlier. C.C.'s aunt was in her late teens when she was convicted and served six months. She has not had any other criminal history since this 25-year-old conviction, and has now raised a family of her own. The SCR record cited by ACS stems from a report when C.C.'s aunt served as a foster parent. The foster child lived with C.C.'s aunt for three years, and the two of them maintain a close relationship to this day – her aunt even becoming the child's godmother. Most importantly, however, is the fact that the SCR investigation was *not* indicated against C.C.'s aunt but rather against her ex-husband who she

no longer lives with or communicates with. Nonetheless, there is no process for C.C. to challenge the denial of foster home placement with her aunt.

117.     Despite its refusal to certify C.C.'s aunt and uncle, ACS has nevertheless recognized that there were no actual safety concerns with placing C.C. with her aunt and uncle and opted to "directly place" her in their care in August 2021. Her aunt and uncle desperately want to keep C.C. in their home, and C.C. desperately wants to remain there, but without foster care funding and services that come with foster home placement, the family is struggling to manage the needs of the household. C.C.'s aunt is currently unemployed, and the lack of certification prevents C.C. from receiving foster care Medicaid or the Childcare Services and Supports. Moreover, C.C.'s aunt and uncle have been unable to obtain food stamps on behalf of C.C. and ACS has provided no assistance to the family.

118.     C.C.'s aunt has asked ACS for donations and requested assistance buying clothes so that C.C. doesn't have to wear the same clothes to school every day. The family also must rely on food pantries to ensure there is enough food for everyone. It was recently recommended that C.C. receive trauma based therapy, which ACS could more quickly and readily provide if C.C. were in a kin foster home. While ACS acknowledges the obvious benefits of allowing C.C. to remain with her aunt and uncle, their refusal to certify them as foster parents is contrary to the best interests of C.C.

119.     C.C. "worries about her placement" and wishes to have stability in her life. The family worries that C.C. would run away if ACS were to remove her from their home. A court ordered evaluation stated that it was "imperative to provide [C.C.] with a safe, stable and positive home environment. An unstable unpredictable care plan will exacerbate her symptoms and compromise her capacity to improve." It is clear that separating C.C. from her aunt and

uncle would be traumatic and detrimental to C.C.'s mental health, overall wellbeing, and likely her academic performance.

120.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiff C.C. appears by her next friend, Lisa Hoyes. Ms. Hoyes is an Assistant Dean at New York University School of Law. She previously represented young people in civil, criminal and family court. Ms. Hoyes is familiar with the issues regarding C.C.'s experience under ACS custody and supervision and is well suited to represent C.C.'s best interests in this case.

**Named Plaintiffs E.R., A.R. and M.R.**

121.     In October 2020, ACS removed E.R., A.R., and M.R. (the "R. children") from their mother's care in Brooklyn. After ACS removed the R. children, their maternal grandmother, Ms. G., requested to care for the children. Ms. G. stated that she wanted the children with her in lieu of ACS placing them in a stranger's home. Ms. G. was the only family member to come forward and request that the children be placed in her care.

122.     ACS agreed that Ms. G.'s home was the best place for the children to reside. Ms. G.'s only hesitation was the type of assistance ACS would provide her to help care for the R. children. Since she had an accident in spring 2020, Ms. G. has relied on public benefits to support herself and other family members. Ms. G. made it clear to ACS that it would be incredibly difficult for her to stretch her existing resources to cover the cost of caring for three young children.

123.     ACS initially agreed in October 2020 to begin the foster parent certification process of Ms. G. for the R. children. Ms. G. was forthcoming about her prior history involving a criminal case and child welfare investigation against her. Specifically, in 2008, Ms. G. was

arrested for robbery. Although she maintained her innocence, Ms. G. pled guilty to the robbery charge and served six months in prison.

124.     While Ms. G. was incarcerated, ACS opened an investigation after receiving a report of neglect of her children. Her children were residing with their father in another state but he had voluntarily placed the children into ACS custody. Even though Ms. G. was incarcerated at the time, ACS indicated a neglect case against her shortly before Ms. G. completed her prison sentence. It is unclear what ACS's basis was for indicating a case against Ms. G. while she was incarcerated, but the case was dismissed in family court.

125.     Knowing Ms. G.'s prior history, ACS still agreed to proceed with the process of foster parent certification for the R. children. The R. children continued to reside in Ms. G.'s home and the family was under the impression that Ms. G. would be certified for the R. children shortly. However, in December 2020, ACS informed the family that it would not certify Ms. G. for the R. children because of her criminal conviction and SCR record.

126.     ACS refused to provide the R. children or Ms. G. with written notice officially denying foster care certification. Nor is there any process for the children to challenge ACS's decision. Rather than being placed in a certified kin foster home, the R. children were directly placed with Ms. G. Direct placement was "required based on an 2008 conviction unrelated to children or violent behavior against a person." ACS did not object to the R. children remaining in Ms. G.'s home.

127.     Despite ACS's effective acknowledgement that the R. children are best cared for in Ms. G.'s home, it denies them needed Childcare Supports and Services that come with foster home placement. As a result, the family has struggled financially. Other than some clothes for

the children when they were initially placed with Ms. G., ACS has not provided any other assistance to the children.

128.     Ms. G. has difficulty covering the cost of rent with her public assistance and Ms. G.'s landlord at one point threatened her with eviction. She was unable to receive rental assistance from public funding or from organizations that assist tenants with covering rent. Ms. G. occasionally receives money from friends, but that has merely kept her and the R. children above water.

129.     Ms. G. remains out of work, having lost her job due to the Covid-19 pandemic. Thus, Ms. G. is forced to rely upon unemployment payments to support the family and has found herself struggling to feed a family of six with limited food stamps each month.

130.     Ms. G. works hard to provide a loving and stable home for the R. children. She ensures the children do their homework and study for tests. One of the children was able to dramatically improve her grades since moving in with Ms. G., and in fact now has a 100% passing grade. The other children are also doing extremely well under Ms. G.'s care.

131.     Ms. G. has consistently told ACS that she desperately needs the Childcare Supports and Services of foster home certification for the R. children. Without foster care support, the R. children's placement with Ms. G. is at risk. The R. children's long standing relationship with Ms. G., as well as the recent trauma of being removed from their mother—their sole caretaker since birth—would make removing the R. children from Ms. G. devastating for the children.

132.     Pursuant to Rule 17(c)(2) of the Federal Rules of Civil Procedure, Named Plaintiffs R. children appear by their next friend, Peggy Cooper Davis. Ms. Davis is familiar with the issues regarding the R. children's experience under ACS custody and supervision and is well

suited to represent the R. children's best interests in this case. Ms. Davis is a Professor of Law at New York University School of Law. She also previously served as a judge of the Family Court of the State of New York.

**DEFENDANTS**

133. Defendant Governor Hochul is the Governor of the State of New York and is sued in her official capacity. Under N.Y. CONST. art IV, § 3, the Governor is required to execute laws and, therefore, is responsible for ensuring that all New York executive departments and agencies, including OCFS and the local departments of social services that OCFS supervises, such as ACS, comply with all applicable federal and state laws.

134. Defendant Sheila Poole is the Commissioner of OCFS and is sued in her official capacity. OCFS is the executive agency responsible for programs involving foster care, adoption and adoption assistance for children in New York State. OCFS is responsible for overseeing ACS and ensuring that ACS complies with all applicable federal and state laws. As Commissioner, Defendant Poole is responsible for the administration, regulation, and supervision of the child welfare system in the State of New York. Defendant Poole is also responsible for providing training to employees of local departments of social services, such as ACS, with regard to the care of children removed from their parents.

135. Defendant the City of New York (the "City") is a municipal entity created and authorized under the laws of the State of New York. The City is charged with certain duties and responsibilities under the Social Services Law and the Family Court Act, which include, but are not limited to, the care and protection of New York City children. The City carries out its responsibilities to children in the child welfare system by and through ACS, and is authorized by law to maintain and be responsible for ACS. ACS delegates the care of New York City children in foster care by contract to 26 foster care provider agencies. As used herein, the term "ACS"

includes both ACS and the agencies under contract to ACS. Pursuant to its Charter, the City is responsible for ensuring that ACS complies with federal and state law and regulation.

**JURISDICTION AND VENUE**

136.    This action is brought pursuant to 42 U.S.C. § 1983 to redress violations of the Constitution of the United States. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3). Each of the Defendants is a resident in, or organized under the laws of, the State of New York.

137.    This Court has the authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202, its inherent equitable powers, and Rule 57 of the Federal Rules of Civil Procedure.

138.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the Plaintiffs' claims occurred in this district. Additionally, Defendants OCFS and ACS maintain offices in the Eastern District of New York.

**FACTUAL ALLEGATIONS**

**A.      CHILDREN IN NEW YORK CITY'S CHILD WELFARE SYSTEM**

139.    Almost 8,000 children are in foster care in New York City under the custody and control of ACS. In Fiscal Year 2020 alone, 3,094 children were removed from their parents' custody due to allegations of abuse or neglect and entered foster care in New York City.

140.    A disproportionate number of children in foster care in New York City are African American and Latinx. African American children enter the child welfare system in numbers far greater than their proportion of the general population. For example, while African American children represent almost 21.6% of New York City's youth, 50% of children removed from their parents' custody are African American. Latinx youth in NYC are 5.6 times more

38

likely than their white counterparts to be admitted into foster care. And over 80% of children who remain in foster care are African American or Latinx. All Named Plaintiffs are children of color.

141. There is also a disproportionate number of low-income children who come to the attention of the child welfare system. Nationally, nearly half of families who have children removed from their homes have trouble paying for basic necessities.

142. Families often come to the attention of the child welfare system for reasons directly related to poverty. According to one study, families who are "below the poverty line are 22 times more likely to be involved in the child protection system than families with incomes slightly above it." This is partly because New York's definition of "neglect" closely resembles common experiences of impoverished children. Over 70% of allegations of child maltreatment are based on "neglect."

143. SCR abuse and neglect investigations disproportionally target poor people and people of color. According to OCFS data, there is an "extreme disparity" in the ratio of unique black and Hispanic children in SCR reports (per 1,000 black and Hispanic children) in New York City as compared to the rate for white children. The community districts in New York City with the highest rates of child poverty have rates of SCR investigation four times higher, on average, than the districts with the lowest rates of child poverty. And among districts with similar poverty rates, those with higher concentrations of African American and Latinx residents tend to have higher rates of SCR investigations.

144. These neighborhoods with the highest number of ACS cases have the lowest incomes, highest unemployment, and greatest income-to-rent disparities in the city. In some of

these neighborhoods, the child poverty rate is over 80%. Many of these neighborhoods are also the biggest sources of families entering homeless shelters.

**B.      THE IMPORTANCE OF KIN CAREGIVERS TO THE WELL-BEING OF CHILDREN REMOVED FROM THEIR PARENTS BY ACS**

145.    As child welfare practitioners know and social science research confirms, forcibly separating children from their parents – even where removal from the home is necessary – can have lifelong negative consequences to the child's physical and emotional health and wellbeing. For the thousands of children removed from their parents and taken into ACS custody, the experience can be extraordinarily traumatizing.

146.    The data with regard to the impact foster care has on children, both nationally and locally in New York City, is grim. Children who have spent time in stranger foster care have poorer school performance and are more susceptible to homelessness, arrest, chemical dependency, and mental and physical illness than socioeconomically similar children who have never been removed from their homes.

147.    In New York, children are particularly vulnerable. Federal data demonstrates that children in foster care are at a higher risk of maltreatment than almost anywhere else in the country. Indeed, New York State ranks the third worst for rates of substantiated reports of maltreatment of children in foster care.

148.    The outlook is considerably brighter for children placed with Kin Caregivers. Social science research establishes that placing a child with a Kin Caregiver eases the trauma of family separation, minimizes the need for the child to adjust to an entirely new environment, and reduces the likelihood that a child will develop behavioral and psychological disorders. Children in kinship foster placements are two times more likely than those in stranger foster homes to report positive emotional health.

40

149.     For a child, the opportunity to live with a Kin Caregiver can provide a dramatically better outcome than stranger foster care and can allow the child to maintain a sense of "normalcy" after removal from a parent. It may mean the child continues to live with someone to whom the child has been close throughout her life, an adult who has played a major role in her childhood, and/or someone who has been a part of her family support system. These adults can be a child's lifeline during a traumatic period of change.

150.     As the federal Children's Bureau has found, "[k]inship care can reduce the trauma that children may have previously endured and the trauma that accompanies parental separation by providing them with a sense of stability and belonging in an otherwise unsettling time." The Kin Caregiver may also feel a sense of commitment to the child as a result of their relationship with the child, the child's parent(s), and/or the larger family.

151.     Children placed with Kin Caregivers are more likely to be placed with their siblings and close to their homes than children in the general foster care population. In New York City, ACS data indicates that 32% of children initially placed with a Kin Caregiver are placed within their home community district, as compared to only 14% of children placed in stranger foster homes.

152.     Children in foster care do better when they are not moved from foster placement to foster placement, but rather have a stable placement. Research establishes that children in kinship placements experience more stability than those in stranger care. An analysis of ACS data shows that in New York City, children in stranger care experience approximately *three times* as many placement moves as children in kinship placements. This data mirrors research showing that children in foster care are 2.6 times more likely than children in kinship care to have 3 or more placements and are 1.9 times more likely to experience a placement disruption.

153.     Children in kinship foster placements are less likely to age out of foster care without a permanent home – whether through reunification with their parent(s), adoption, or guardianship – than children in stranger foster homes. Children in kinship foster care are more likely to report liking their placement and wanting it to become permanent. A permanent home is critical to the long-term safety and well-being of children, and can prevent homelessness, sexual exploitation, and unemployment.

154.     Children can achieve permanency with Kin Caregivers in several ways. Adoption by a Kin Caregiver allows children to permanently remain in a familiar, safe and loving home. The child can maintain connections with their family and community while also receiving monthly subsidies and medical assistance. Likewise, their Kin Caregiver receives parenting support for their care.

155.     Alternatively, placement in foster care with a Kin Caregiver also opens up the possibility of permanency through KinGAP. KinGAP can be appealing for a child and Kin Caregiver because it does not require termination of parental rights, a process that can be emotionally fraught for the child, parent and kin. Under KinGAP, the Kin Caregiver holds legal responsibility for the care, control and supervision of the child and receives a subsidy comparable to the adoption subsidy.[3] To be eligible for KinGAP, the Kin Caregiver must have been the child's foster parent for at least six months.

156.     New York State uses an expanded definition of kin, including fictive kin, for purposes of foster parent certification and KinGAP. In defining kin broadly, New York

---

[3] The amount of the kinship guardianship assistance payment and of the adoption subsidy payment ranges from 75% to 100% of the foster care rate.

recognized that many children are raised in non-traditional families, and benefit from including non-traditional family members in their long term planning in order to preserve familial bonds.[4]

## C. NEW YORK'S STATUTORY AND REGULATORY SCHEME FOR CERTIFYING KIN CAREGIVERS AS FOSTER PARENTS AND ADOPTIVE PARENTS

157. In recognition of the importance of keeping a child with family and minimizing trauma, ACS is required to make diligent efforts to find a Kin Caregiver able to care for the child when it removes a child from their parent(s). Specifically, OCFS regulations require ACS to act diligently to identify the child's grandparents, all parents of a sibling or half-sibling of the child where such parent has legal custody of the sibling, and other adult relatives, including adult relatives suggested by the child's parent(s), within 30 days.[5] ACS must then notify these relatives that the child has been or is being removed from the child's parents and explain options for the child's care to the Kin Caregiver.

158. Because most Kin Caregivers for the Plaintiff Class do not have the ability to care for a child without Childcare Services and Supports, when ACS identifies a potential Kin Caregiver, they usually work to certify the Kin Caregiver as a foster parent. New York state law and OCFS regulations dictate the process by which any person, including a Kin Caregiver, can be certified as a foster parent.[6] Similarly, in order to serve as a potential adoptive parent, a Kin Caregiver must go through the adoptive parent approval process.

---

[4] New York law defines kin to include any individual related to a half-sibling of the child through blood, marriage or adoption and where such person is also the prospective or appointed relative guardian of such half-sibling *or* an adult with a pre-existing positive relationship with the child including, but not limited to, a step-parent, godparent, neighbor or family friend.

[5] In 2020, OCFS issued an administrative directive regarding Kin First Firewall practice, which further outlined the steps that local departments of social services, such as ACS, must take to identify and engage kin. The directive also put into place a review process to ensure that all kin foster placements had been considered.

[6] While the Kin Caregiver's application for foster parent certification is in process, the child may be temporarily placed with the Kin Caregiver, subject to an emergency ACS review of the home. If the child is temporarily placed, the Kin Caregiver may be provided Childcare Services and Supports while the application is pending. If certification of the Kin Caregiver is denied, ACS must initiate a plan to remove the child from the home.

159.    During the certification and approval process, ACS is required to collect detailed

information about the Kin Caregiver's household, and determine if the specified physical, health,

and safety requirements are met. In addition, ACS must request SCR records for a child's Kin

Caregiver and all adult household members from OCFS. ACS must also obtain the fingerprints

of the Kin Caregiver and all adult household members and submit them to OCFS. OCFS then

requests a criminal history check from the New York State Division of Criminal Justice Services

(DCJS) and the Federal Bureau of Investigation (FBI).

160.    OCFS provides ACS with a summary of any SCR record as well as of the

criminal history record. Regarding the criminal history record, OCFS also notifies ACS whether,

based on the history, the application must be denied (due to mandatory disqualification), must be

held in abeyance pending subsequent notification from OCFS,[7] or may proceed. If OCFS does

not find a conviction that qualifies as a mandatory disqualifying crime, ACS has the discretion to

certify the Kin Caregiver for the foster care placement or adoption of a child. OCFS provides no

guidance as to the exercise of this discretion.

161.    If the Kin Caregiver is ultimately certified as a foster parent, the family receives

Childcare Services and Supports. The Supports include maintenance payments intended to

reimburse the family for the cost of caring for the child and various allowances that benefit the

child, such as transportation, clothing allowance, school related expenses and miscellaneous

expenses of growing up in New York City. The Services include coordination and provision of

services for the child's medical, mental health, and scholastic needs, and training to assist in

providing proper care for the child. If the child has special needs, a Kin Caregiver may be able to

---

[7] A final determination of an application for certification or approval of a Kin Caregiver must be held in abeyance if
the Kin Caregiver's criminal history record reveals a pending charge for a mandatory disqualifying crime or when
there is uncertainty as to whether a conviction falls into one of the categories listed above.

be certified as a therapeutic foster home and receive enhanced payment and services from ACS and specialized, ongoing training to assist in caring for the child.

162.    Moreover, children in foster care are automatically eligible for Medicaid which provides enormous assistance in caring for the child's physical and psychological health.[8] With Medicaid, children receive well-child care, immunization, diagnosis and treatment of illness and injury, dental care, vision care as well as any needed emergency or special care and treatment.

163.    Likewise, if approved as an adoptive parent, the family receives an adoption subsidy, caseworker supervision prior to finalization of the adoption, and post-adoption services. Families are also eligible for an adoption tax credit. Post-adoption services may include counseling, caregiver training, clinical and consultative services, and coordinating access to community supportive services for the purpose of ensuring permanence of placement. These services may extend for three years after the date of the adoption and can be a lifeline, especially for families that need help to address their children's mental health issues or other problems.

**The Defendants' Disqualification Systems**

164.    Before 2008, all children in New York were entitled under state law to an individualized assessment of all potential foster and adoptive parent applicants. There were no mandatory disqualifying crimes. However, in 2008, the Defendants began to adopt and implement the Disqualification Systems that deprive the Plaintiff class of their constitutional rights.[9]

---

[8] All children in foster care in NYS who are citizens or qualified immigrants are Medicaid eligible.
[9] In 2008, the federal government began to condition states' receipt of funding under Title IV-E of the Social Security Act (42 U.S.C. §§ 671-679b) on their automatic disqualification of proposed foster and adoptive parents who had been convicted of certain categories of crimes. OCFS's determination of which crimes fall into each of the federally designated categories is more expansive than those used in many other states.

*Mandatory Disqualification System*

165.    Under state law, if a child's Kin Caregiver has been convicted of certain felony crimes the Kin Caregiver is ineligible to be the child's foster or adoptive parent and their application *must* be denied. As a result, the child is automatically denied foster or adoptive placement with that Kin Caregiver, regardless of the nature and duration of the relationship between them and regardless of whether the conviction has any bearing on the Kin Caregiver's current ability to care for their relative child.

166.    Specifically, NY Social Services Law § 378-a(2)(e)(1) requires that "an application for certification or approval of a prospective foster parent or prospective adoptive parent shall be denied and … an agreement to provide payments to a prospective successor guardian … shall not be approved … where a criminal history record of the [applicant] … reveals a conviction for: (A) a felony conviction *at any time* involving: (i) child abuse or neglect; (ii) spousal abuse; (iii) a crime against a child, including child pornography; or (iv) a crime involving violence, including rape, sexual assault, or homicide, other than a crime involving physical assault or battery; or (B) a felony conviction within the past five years for physical assault, battery, or a drug related offense" (emphasis added).

167.    OCFS broadly defines the crimes falling within the statute's categories. As of March 2016, OCFS had designated nearly 300 felonies that require lifetime mandatory disqualification, including certain "attempted" felonies. There are approximately 40 other felonies, including certain drug possession offenses, that require a five year mandatory disqualification.

168.    These disqualifying felony crimes include Criminal Possession of Marijuana, Falsely Reporting an Incident, Second Degree Vehicular Manslaughter and Criminal Possession of a Weapon. Under OCFS policy, a felony conviction for an attempt to commit a disqualifying

46

crime (other than a Class E felony) is also a disqualifying crime. These crimes result in automatic disqualification regardless of how long ago they occurred, and regardless of how successfully the Kin Caregiver has been rehabilitated. Assault, battery and drug related convictions must be within the past five years to result in automatic disqualification.

169.    While the exact number of children denied kin foster or adoptive homes as a result of mandatory disqualifying convictions is unknown to the Named Plaintiffs,[10] criminal conviction data hints at the potential sweeping impact of this Mandatory Disqualification System. In 2019 alone, over 20,000 adults were convicted of a felony in New York State that would bar them from ever becoming a foster or adoptive parent, regardless of the existing relationship they have with the child. Another 18,385 were convicted of a drug offense, including convictions for possession of marijuana, which would bar them from being a foster or adoptive parent within five years of their application.

170.    This same data reveals that Defendants' unconstitutional disqualification practices have a disproportionate impact on families of color and serve to reinforce other discriminatory government practices. In New York, disproportionate minority contact with police, systemic racism, and poverty lead to a higher conviction and incarceration rate for African Americans. For example, in 2018 in New York City alone, 4,458 African American New Yorkers were convicted of a felony as compared to 902 white New Yorkers. African Americans make up only 16% of the total population in New York State, yet they comprise 53% of the incarcerated population.

171.    Apart from challenging the accuracy of the criminal record, a Kin Caregiver with a mandatory disqualifying conviction has no recourse in order to be certified as a foster parent or

---

[10] In response to an April 2018 Freedom of Information Law request, OCFS confirmed that it does not categorize, define or tally this data or similar data on children whose prospective kin foster parent had a discretionary disqualifying crime or SCR history.

approved as an adoptive parent.[11] There is no procedure for the child or anyone acting on the child's behalf to challenge ACS's denial of foster care or adoption approval when their Kin Caregiver has a mandatory disqualifying conviction.[12]

***The Discretionary Criminal History Disqualification System***

172.    ACS may deny a child placement with a Kin Caregiver if the kin's criminal history record reveals a *charge* (even if the charge resulted in no conviction) or a conviction for *any* other crime at any point in the Kin Caregiver's past other than those categorized as mandatory disqualifiers. ACS may also deny a Kin Caregiver's application based upon any criminal record of any other household member over 18, including the Kin Caregiver's own children.[13]

173.    While the exact number of children denied kin foster or adoptive homes as a result of the Discretionary Criminal History Disqualification System is unknown to the Named Plaintiffs, the potential impact of this problem is exemplified by criminal conviction data. In 2017 alone, 155,326 adults in New York State were convicted of discretionary disqualifying crimes that could be the basis for ACS to deny a foster or adoptive parent application.

174.    Neither OCFS nor ACS provides guidance on how ACS should appropriately exercise discretion if a discretionary disqualifying conviction exists. As a result, ACS makes

---

[11] ACS must only provide the Kin Caregiver with a written statement setting forth the reasons for the denial, including a summary of the criminal history record provided by OCFS, and offer a meeting to discuss the denial. ACS must provide the Kin Caregiver with a description of the DCJS and FBI record review process, which allows the Kin Caregiver to contact DCJS or the FBI to correct errors in the record. Although adoptive parents may seek a fair hearing if their application is denied, in cases where the denial is based on a mandatory disqualifying conviction, there is no available relief.

[12] If the Kin Caregiver is disqualified for a mandatory disqualifying crime involving spousal abuse, he or she can apply for a fair hearing on the grounds that he or she was the victim of physical, sexual or psychological abuse by the victim of such offense and such abuse was a factor in causing the Kin Caregiver to commit such offense.

[13] If the child is temporarily placed with the Kin Caregiver and the criminal history record of the Kin Caregiver or an adult household member reveals a discretionary disqualifying conviction, state law requires ACS to conduct a safety assessment of the home in order to determine whether to proceed with foster parent certification or adoption approval of the Kin Caregiver.

inconsistent determinations and routinely deprives the Plaintiff Class of placement with Kin Caregivers due to discretionary disqualifying criminal history notwithstanding their current ability to provide a safe home for their relative child.

175.    OCFS requires ACS to provide the Kin Caregiver with a written statement setting forth the reasons for the denial, offer a meeting to discuss the denial, and provide information about the DCJS and FBI review process for purposes of correcting factual errors in the criminal record. If the Kin Caregiver is a prospective foster parent, neither ACS nor OCFS offer them any further opportunity to challenge the denial.  If the Kin Caregiver is a prospective adoptive parent and their application is denied they may request a fair hearing. For both foster and adoptive placement denials, there is no opportunity for the child to challenge the decision.

### The SCR Disqualification System

176.    As part of the foster or adoptive parent application, a Kin Caregiver and any person 18 years of age or older residing in the Kin Caregiver's home must consent to an ACS review of the SCR records pertaining to them.

177.    New York's SCR includes all investigations of reports of maltreatment of children, regardless of the outcome of the investigation. Anyone can make a report to the SCR for investigation and reports can be made anonymously. As discussed below, there are numerous problems with New York's SCR. The SCR currently has one of the lowest standards of evidence to place an individual on the registry, requiring only "some credible evidence."[14] An "indicated" report does not reflect whether a petition was ever filed against the person in Family Court, nor

---

[14] Recognizing the problems with the SCR, the New York State Legislature passed several reforms to the registry as part of the 2020-2021 state budget. The new legislation raises the standard for an indicated case from "some credible evidence" to a "preponderance of the evidence" and requires that every Fair Hearing challenging the indication include an assessment of rehabilitation. In addition, if you prevail in your Family Court case, your record in the SCR is amended and sealed, and records of *neglect* cases will now automatically be sealed at 8 years. Unfortunately, these historic reforms will not go into effect until January 2022 and many of the changes are not retroactive. It is also unclear whether ACS will still have access to records once they are sealed.

does it reflect whether the Family Court ever issued a finding against the person for abuse or neglect. And once a report is added to the SCR database, it remains there for ten years after the 18th birthday of the youngest child listed in the report – which can be up to 28 years.

178.     The SCR system has a racially disproportionate impact on Black and Latinx New Yorkers. African American children in NYC are 6.2 times more likely to be reported to the SCR as white children, the report is 7.8 times more likely to be indicated, and the child is 12.8 times more likely to be admitted into foster care, according to 2014 OCFS data. Latinx children in NYC are also more likely to be implicated in an SCR record when compared to their white counterparts and are 5.4 times more likely to be involved in an indicated case.

179.     Nonetheless, OCFS regulations require that ACS review these SCR records in assessing a child's Kin Caregiver for a foster or adoptive placement. For foster care placement, OCFS Administrative Directive requires ACS to take additional steps if the SCR review reveals that the Kin Caregiver or adult household member is a confirmed subject of an indicated report, including requesting the underlying investigation records, in order to have "complete and accurate information," determine whether the information is "relevant and reasonably related," and "make an informed decision" regarding certification of the home. Despite this OCFS requirement, upon information and belief, ACS rarely requests these underlying documents.

180.     OCFS has also provided guidance as to what ACS should consider when evaluating whether the SCR record of an applicant or household member should prevent foster parent certification of the home. These factors include but are not limited to the seriousness of the incident involved in the report; the relevant circumstances surrounding the report; the time elapsed since the most recent incident; and information regarding the applicant's rehabilitation.

181.     Despite this guidance, OCFS fails to oversee and ensure that ACS relies upon its guidance in exercising discretion to certify Kin Caregivers as foster parents.

182.     OCFS also fails to provide *any* guidance or oversight over the exercise of discretion in assessing *adoptive* placements with Kin Caregivers who have a SCR record.

183.     While the exact number of children denied placement with Kin Caregivers based on SCR history is unknown to the Named Plaintiffs, the potentially enormous impact of SCR records on certification and approval decisions is suggested by SCR data. In 2019, for example, there were 54,879 SCR investigations in New York City alone, of which 37.2% resulted in indicated reports. As such, a SCR record – supported by "some credible evidence" – has the potential to disqualify a large number of potential foster parents, many of whom may be well-suited to care for their kin.

184.     If the Kin Caregiver's application is denied, ACS is required to furnish the Kin Caregiver with notice setting forth its reason(s) for the denial, including whether the denial is based in whole or in part on the existence of an indicated SCR report. The notice must also inform the Kin Caregiver that he or she has the right, pursuant to Social Services Law 424-a, to request a hearing before OCFS regarding the SCR record. The child is not entitled to notice or a hearing.

185.     The OCFS hearing offered to the Kin Caregiver is not an opportunity to review the denial itself, but only whether the Kin Caregiver has been shown by a fair preponderance of the evidence to have committed the act or acts of child abuse or maltreatment giving rise to the indicated SCR report. The Kin Caregiver cannot present any evidence of rehabilitation or evidence demonstrating that the record has no bearing on his or her ability to be a suitable foster

or adoptive parent.[15] The child has no right to an OCFS hearing or any opportunity to have the denial of his or her foster care or adoptive placement reviewed.

186. In some instances, ACS places a child with a Kin Caregiver on a temporary emergency basis and conducts a preliminary emergency evaluation of the home, until a full evaluation can be completed. If, in doing so, ACS concludes that an SCR record precludes a Kin Caregiver from emergency certification, ACS does not provide the Kin Caregiver or child with any written notice. ACS also refuses to refer the Kin Caregiver for full foster care certification. In doing so, ACS simultaneously denies the child foster care placement with the Kin Caregiver without a meaningful assessment and fails to provide written notice to the child or Kin Caregiver.

## D. DEFENDANTS' DISQUALIFICATION SYSTEMS VIOLATE THE PLAINTIFF CLASS'S SUBSTANTIVE AND PROCEDURAL DUE PROCESS RIGHTS

187. The Plaintiff Class has a fundamental right under the Constitution of the United States to the preservation of family association and integrity, to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and to be under government care or supervision no longer than is necessary. The Plaintiff Class also has a constitutional right to notice and an opportunity to challenge any denial of their rights. Defendants' Disqualification Systems violate these fundamental rights.

188. As a direct result of Defendants' unconstitutional Disqualification Systems, thousands of New York City children have been or will be denied safe foster or adoptive placements with loving Kin Caregivers. Defendants' disqualification policies and practices

---

[15] Even if, as a result of the hearing, it is determined that OCFS has failed to show by a fair preponderance of the evidence that the Kin Caregiver committed the act or acts upon which the indicated report is based, ACS still has complete discretion whether to certify the home.

subject all Plaintiff Class to an undue risk of emotional and psychological harm and further the trauma of parental removal.[16]

189.    Because potential adoptive parents face the same barriers as potential foster parents, Defendants' unconstitutional disqualification policies and practices are further violating the Plaintiff Class's due process rights by preventing them from achieving permanency and stability through adoption by Kin Caregivers.

190.    Defendants are aware of the harm to the Plaintiff Class when they deny children placement with a Kin Caregiver as a result of their disqualification policies and practices. As set forth above, the Plaintiff Class who could have been placed with loving, familiar relatives are instead thrust into stranger foster care or institutional group care or are left without necessary services and supports. Families are at times advised to further split up, having the household member with the conviction leave the home, in order to attain ACS approval. After the trauma of separation from their parent(s), the Plaintiff Class is further harmed by the denial of placement with their Kin Caregiver or their actual or threatened removal from the Kin Caregiver's home.

191.    Indeed, it is often undisputed that placement with a Kin Caregiver is in the child's best interest, even when certification of the Kin Caregiver is denied as a result of one of these Disqualification Systems. In some of these instances, as described above, ACS approves placement of the child "directly" with the very same Kin Caregiver who has been denied certification. According to OCFS data, across New York State, since 2012, "16,183 children [have been diverted] from foster care through the use of direct custody placements."

---

[16] Again, the disproportionate impact of Defendants' disqualification policies and practices on African American children is glaringly apparent in the data on KinGAP accessibility. According to an ACS Deputy Commissioner, African American children are 45% less likely to be discharged to KinGAP than white children.

192.     When ACS directly places the Plaintiff Class with Kin Caregivers, it shirks its responsibility to support and adequately care for these children. The Plaintiff Class are denied Childcare Services and Supports, including foster care maintenance payments, clothing allowances, reimbursement for school related expenses, transportation, camp fees, or any of the many miscellaneous expenses of growing up in New York City. In addition, the children do not benefit from the coordination and provision of services for their medical, mental health or scholastic needs, and automatic enrollment in Medicaid.

193.     According to a report by the American Association of Retired Persons on kinship care, direct placement with a Kin Caregiver leaves the family with the burdens of family court involvement but "without the supportive systems in place to provide for the needs of the child." While this diversion has saved the government money, "funding to support those kinship resources has remained extremely low" ignoring "many families' need for additional support."

194.     It is apparent that the lack of financial support is detrimental to the Plaintiff Class. Among foster children living with kin in 2012, 21% had no health insurance coverage, and 44% were living below the federal poverty level. It is estimated that raising a child in New York City costs an average of $500,000; these families desperately need the financial and general welfare supports and services that are provided through foster care.

195.     In addition, children "directly placed" with a Kin Caregiver are not eligible for assistance with service referrals and coordination for medical, mental health or school needs from ACS. Moreover, ACS no longer ensures Medicaid for the child.[17] This can be devastating for children in the care of these Kin Caregivers. Without the necessary services and supports,

---

[17] Without automatic Medicaid coverage through ACS, it can be difficult for families to secure Medicaid coverage for the child in their care. The child's biological parent(s), who is subject to an open Article 10 case in Family court, often holds the medical information and paperwork necessary to secure insurance coverage for the child.

these placements have a greater likelihood of failure, resulting in the child being moved again to a different placement, compounding the harm to the Plaintiff Class. Adoption and KinGAP are also foreclosed by direct placement since by law the Kin Caregiver would have to first be a foster parent in order to qualify.

196.     Kin Caregivers are "more likely to experience increased stress due to having to manage relationships with the parents of the children in their care and take on a new parenting role." Moreover, according to the American Association of Retired Persons, "children in kinship caregiver homes who have had interaction with the child welfare system have higher rates of trauma (38% of children involved in child welfare under 3 years old have experienced severe trauma), leading to higher rates of behavioral and emotional health disorders and a disruptive home life."

197.     Despite being aware of the myriad harms to the Plaintiff Class as a result of their disqualification policies and practices, Defendants fail to provide adequate oversight of the foster and adoptive parent certification process.

198.     Indeed, a 2016 federal audit found that OCFS does "not monitor these processes [background checks for foster and adoptive parents] to ensure compliance," including failing to put into place a "case planning process … to ensure appropriate follow-up." There is also no indication that OCFS conducts any review of denied foster or adoptive parent applications.

199.     ACS similarly fails to adequately monitor the foster parent certification process. As the New York City Comptroller reported in a 2019 report on the certification process:

> ACS has no process in place to independently verify that its contracted foster care providers are properly certifying prospective foster care families in accordance with City and State requirements prior to their issuance of certifications and the placement of children with foster families. In addition, although ACS conducts post-certification audits to assess whether required steps were taken and

documented for recently certified and recertified foster care families, we found that ACS is not utilizing this tool effectively.

200. The Comptroller concluded that "[a] significant factor that directly contributed to the above weaknesses is that ACS management has failed to develop, implement and employ procedures and measures to effectively monitor and oversee its contracted foster agencies with regard to the foster care certification process."

201. Defendants also fail to provide effective guidance, in the form of policies or directives, to ensure that children are not being inappropriately denied safe foster and adoptive placement with Kin Caregivers.

202. OCFS provides minimal guidance to ACS regarding the appropriate process for evaluating whether to certify a foster or adoptive home where the Kin Caregiver or household member has a criminal record. In a single attachment to an Administrative Directive, OCFS provides a list of factors to be considered during "safety assessments" conducted after a criminal record is found.

203. Although OCFS provides some guidance with regard to assessing the application of a potential kin foster parent with SCR history or criminal record, it fails to ensure that ACS is adhering to its policies and guidelines. OCFS is also silent on how ACS should properly assess an adoptive applicant with SCR history or criminal record, including what, if any, weight should be given to any SCR history.

204. ACS fails to provide any policies, directives or guidance on how ACS staff and contracted agencies should evaluate a foster or adoptive home where a Kin Caregiver or household member has criminal or SCR record.

205.     Moreover, upon information and belief, both OCFS and ACS fail to ensure that their staff and contracted agencies are adhering to state regulations and policy, including providing notice to the Kin Caregiver once a decision has been made.

206.     Neither OCFS nor ACS keep track of or collect data in a way that enables them to assess the certification and background check process and correct problematic practices.

207.     These systemic failures are evident in the histories of each of the Named Plaintiffs. Defendants' failure to provide adequate guidance and oversight over the certification process, including the background check requirements, results in a system that fails to make individualized and meaningful determinations of the suitability of Kin Caregivers and routinely deprives the Named Plaintiffs and the Plaintiff Class of placement with Kin Caregivers notwithstanding their current ability to provide a safe home for their relative child.

***Defendants' Mandatory Disqualification System Violates the Constitutional Rights of the Plaintiff Class***

208.     Defendants' Mandatory Disqualification System violates the Plaintiff Class's right to the preservation of family association and integrity, to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and to be under government care or supervision no longer than is necessary. It further denies them due process to challenge the deprivation of a safe foster or adoptive placement with a Kin Caregiver.

209.     The statute creates an irrebuttable presumption that Kin Caregivers with certain criminal history are unfit to be foster or adoptive parents to a related child, regardless of their relationship with that child or the suitability of their home.  As a result, children such as B.B., J.R. and the R. children are denied the ability to live in a loving and appropriate home with a member of their family.

210.     OCFS has set an expansive list of crimes that would automatically bar a Kin Caregiver from caring for a member of the Plaintiff Class. As a result, there are nearly 300 crimes that could deny the Plaintiff Class a familial foster or adoptive home, regardless of how long ago the crime occurred and whether the Kin Caregiver has been rehabilitated. And approximately 40 other felonies that require a five year mandatory disqualification.

211.     Moreover, because the statute creates an irrebuttable presumption that these Kin Caregivers are unfit to be foster or adoptive parents to a related child, the Plaintiff Class have no recourse to challenge these denials. And because a Kin Caregiver cannot be a KinGAP guardian without being first certified as a foster parent, that path to placement with a Kin Caregiver is closed to the Plaintiff Class as well.

212.     Defendants deny the foster or adoptive parent applications of Kin Caregivers without any analysis as to whether the Kin Caregiver's conviction bears on his or her ability to care for the Plaintiff Class. In some cases, these convictions are decades old and do not reflect upon the Kin Caregiver's ability to successfully parent today. The relationship between the Kin Caregiver and the child may be close and life-long, but these factors are deemed irrelevant. Indeed, there is no opportunity for the Plaintiff Class or the Kin Caregiver to challenge the relevance of the conviction to the Kin Caregiver's ability to care for the child or the propriety of ACS's decision to deny the placement.

213.     OCFS itself has admitted that a full, individualized analysis of a Kin Caregiver's home is necessary to make an accurate assessment of the suitability of a home when there is a criminal history record. When New York passed the mandatory disqualification requirements, OCFS advocated for individualized review rather than the Mandatory Disqualification System. In a statement to the Acting Counsel to the Governor, OCFS Deputy Commissioner concluded

that "comprehensive standards that look at criminal histories on a case-by-case basis are important to enable certain appropriate relative placements to occur."

214. OCFS further admitted that it is important to be able to facilitate kinship placements when "the particular history and background of the potential caregiver demonstrates that the placement is in the child's best interest and is stable and safe. Without the ability to conduct an individualized assessment in these situations, children who could live in viable kinship care placements may be forced into other foster care and group home arrangements that may be less stable and more traumatic than placing them with relatives."

215. Yet, OCFS and ACS have failed to provide this individualized analysis, thus automatically denying children foster and adoptive placements with Kin Caregivers with mandatory disqualifying convictions, causing irreparable harm to the Plaintiff Class.

216. Moreover, after a mandatory disqualifying conviction is discovered, ACS is required by statute to initiate a plan to remove the foster child from the home. After the trauma of separation from their parent(s), the actual or threatened removal acts as a significant interference with the Plaintiff Class's fundamental right to family integrity and association, causes psychological and emotional harm, increases their time in government custody and further traumatizes these vulnerable children.

***Defendants' Discretionary Criminal History Disqualification System Violates the Constitutional Rights of the Plaintiff Class***

217. Although by statute ACS may certify or approve kin foster or adoptive placements if the Kin Caregiver has a non-mandatory criminal history or an adult household member has a criminal conviction, upon information and belief, in practice ACS routinely treats these convictions as automatic disqualifications or places undue weight on the history and declines to conduct any further analysis of the suitability of the home. Moreover, by denying the

Plaintiff Class a means to challenge these discretionary denials, Defendants unduly interfere with the Plaintiff Class's constitutional rights without due process.

218. First, on information and belief, ACS routinely fails to fully evaluate the Kin Caregiver and their home after learning of a Kin Caregiver or household member's criminal conviction. Upon information and belief, if ACS learns of the criminal conviction directly from the Kin Caregiver, the caseworker often discourages the Kin Caregiver from applying for foster parent certification and/or does not proceed with a full evaluation of the home. Even when the ACS caseworker does proceed with the application and submits the paperwork to OCFS, the inquiry into the home usually ends when the caseworker learns there is a criminal history record. As a result, Defendants routinely fail to conduct a full evaluation of Kin Caregivers (or adult household members) with a criminal history record.

219. Second, even when there is an evaluation of the home and a formal denial is made, Defendants regularly fail to provide the Kin Caregiver with notice of the reasons for the denial, as required by statute and regulation.

220. Third, Defendants fail to provide notice or an opportunity for the Plaintiff Class to challenge the denial of Kin Caregivers as foster or adoptive placements. There is no process for the Plaintiff Class or the Kin Caregiver to challenge the relevance of the criminal history record to the Kin Caregiver's ability to care for the child or the propriety of ACS's decision to deny the placement.

221. Finally, OCFS fails to oversee ACS's practices to address it deficiencies. As a result, Defendants' Discretionary Criminal History Disqualification System denies the Plaintiff Class a safe foster or adoptive home with a familiar Kin Caregiver, and does so without due

process to the Plaintiff Class, subjecting Plaintiff Class to further trauma and emotional and psychological harm.

### *Defendants' SCR Disqualification System Violates the Constitutional Rights of the Plaintiff Class*

222.    Upon information and belief, ACS routinely denies the Plaintiff Class kin foster or adoptive placements by placing undue weight on the Kin Caregiver or adult household member's SCR record and does so without providing notice or a meaningful opportunity for the Plaintiff Class to challenge the denial.

223.    Defendants' exclusive reliance upon SCR records is particularly problematic. An indicated SCR record is not a reliable basis on which to determine that a person is unfit to care for a child. SCR investigations are either unfounded or indicated through a non-adversarial process. As discussed above, the SCR relies upon an extremely low standard for "indicating" a report of abuse or neglect. The SCR requires only "some credible evidence" to support the allegations – a "bare minimum" standard, according to New York's highest court, that "imposes no duty on the fact finder to weigh conflicting evidence, no matter how substantial, and allows a report to be indicated if only one out of several believable items of evidence supports it." An indicated SCR report does not mean that ACS ever decided to open a case for the provision of preventive services to the family. And, an indicated SCR certainly does not mean that ACS ever filed a petition in Family Court, or that a petition resulted in a Family Court finding of abuse or neglect against the subject of the report.

224.    Indicated reports are maintained on the SCR for ten years after the 18th birthday of the youngest child listed in the report – which can be up to 28 years. These indicated reports remain on the SCR during this period regardless of whether the report ever results in a court proceeding. They even remain when a Family Court petition has been filed and has been

dismissed on the merits. Unfounded reports remain on the SCR, available to ACS, for ten years from the date of the report.

225.    Upon information and belief, after learning of a Kin Caregiver's SCR record, either directly from the Kin Caregiver or through an SCR database review, ACS routinely will not proceed with a full evaluation of the home. In defiance of state regulation and policy, ACS often does not even request, let alone review, the underlying SCR record to determine if the information provided is "relevant and reasonably related to the certification or approval" of the home. Moreover, ACS does not then appropriately evaluate all the information provided during the home study and application process to determine whether to certify or approve the home.

226.    Moreover, during an emergency evaluation of the Kin Caregiver, if ACS decides that an SCR record precludes a Kin Caregiver from emergency certification, ACS does not provide any written notice. ACS also refuses to refer the Kin Caregiver for full foster care certification. In doing so, ACS simultaneously denies the child foster care placement with the Kin Caregiver without a meaningful assessment and fails to provide written notice to the child or Kin Caregiver.

227.    Upon information and belief, even when there is an evaluation of the home and a formal denial decision is made, ACS often fails to send notice with the reasons for the denial to the Kin Caregiver as required by statute and regulation, and never sends such notice to the Plaintiff Class. As a result, the Plaintiff Class members are not notified as to why their foster or adoptive placement with their Kin Caregiver has been denied.

228.    As a result, Defendants' SCR Disqualification System denies thousands of Plaintiff Class members a safe foster or adoptive home with a familiar Kin Caregiver.

229.     OCFS additionally fails to oversee ACS's practices sufficiently to identify and address its deficiencies.

230.     At no point in this process is there any opportunity for the Plaintiff Class to challenge the denial of their kin foster or adoptive placement. The only recourse is for the *Kin Caregiver*, and their only recourse is to challenge the validity of the underlying SCR report.

231.     Defendants fail to provide any process for members of the Plaintiff Class or the Kin Caregiver to challenge the relevance of the SCR report to the Kin Caregiver's ability to care for the child or the propriety of ACS's decision to deny the placement. As a result, Defendants are routinely depriving the Plaintiff Class of placement in a foster or adoptive home with a familiar Kin Caregiver and denying the Plaintiff Class any procedural safeguards, subjecting the Plaintiff Class to further trauma and emotional and psychological harm.

## CLASS ACTION ALLEGATIONS

232.     Named Plaintiffs bring this action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of a class of all children in New York City who have been or will be removed from their parents or guardians by ACS pursuant to Article 10 of the Family Court Act, and have been denied or are at risk of being denied a foster or adoptive placement with a Kin Caregiver based on the criminal history or SCR record of the Kin Caregiver or the Kin Caregiver's adult household member.

> a.      The "Mandatory Disqualification Subclass" consists of all Class members who have been denied or are at risk of being denied a foster or adoptive placement with a Kin Caregiver due to Defendants' Mandatory Disqualification System.
>
> b.      The "Discretionary Criminal History Disqualification Subclass" includes all Class members who have been denied or are at risk of being denied a

foster or adoptive placement with a Kin Caregiver due to Defendants' Discretionary Criminal History Disqualification System.

c. The "SCR Disqualification Subclass" consists of all Class members who have been denied or are at risk of being denied a foster or adoptive placement with a Kin Caregiver due to Defendants' Discretionary SCR Disqualification System.

233. The Class is sufficiently numerous to make joinder impracticable. Over 7,000 children are in foster care in New York City under the custody and control of ACS. In Fiscal Year 2020 alone, 3,094 children were removed from their parents' custody and entered foster care. Over 500 children in ACS custody were freed for adoption in 2019 alone. While a more exact number of Class members is unknown to Named Plaintiffs at this time, the proposed Class likely exceeded several hundred members in 2020 alone.

234. The questions of fact and law raised by Named Plaintiffs' claims are common to and typical of those of each member of the Class whom they seek to represent.

235. Questions of fact common to the entire Plaintiff Class include, but are not limited to:

a. Whether Defendants' Disqualification Systems deny class members kin foster or adoptive placements by giving undue weight to the Kin Caregiver's past record.

b. Whether each Defendant fails to conduct adequate oversight to ensure compliance with its laws, regulations and policies governing prospective kin foster and adoptive parent certification process for class members.

236.     Questions of law common to the entire Plaintiff Class include, but are not limited to:

    a.      Whether Defendants' Disqualification System violates class members' substantive rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

237.     Additional questions of fact common to the Mandatory Disqualification Subclass include, but are not limited to:

    a.      Whether the Mandatory Disqualification System denies this subclass of children kin foster or adoptive placements solely on the basis of the Kin Caregiver's past felony record.

    b.      Whether the Mandatory Disqualification System routinely denies this subclass of children an individualized assessment of whether placement in a foster or adoptive home with Kin Caregiver with a mandatory disqualifying conviction is safe.

    c.      Whether the Mandatory Disqualification System denies this subclass of children notice and the opportunity to challenge denials of foster or adoptive placements with Kin Caregivers.

238.     Questions of law common to the Mandatory Disqualification Subclass include, but are not limited to:

    a.      Whether the Mandatory Disqualification System violates this subclass's substantive rights under the due process clause of the Fourteenth Amendment to the United States Constitution.

b.  Whether the Mandatory Disqualification System violates this subclass's procedural due process rights under the Fourteenth Amendment to the United States Constitution.

239.  Questions of fact common to the Discretionary Criminal History Disqualification Subclass include, but are not limited to:

a.  Whether the Discretionary Criminal History Disqualification System denies this subclass of children kin foster or adoptive placements by giving undue weight to the Kin Caregiver's or adult household member's criminal record.

b.  Whether the Discretionary Criminal History Disqualification System denies this subclass of children notice and an opportunity to challenge denials of foster or adoptive placements with Kin Caregivers.

240.  Questions of law common to the Discretionary Criminal History Disqualification Subclass include, but are not limited to:

a.  Whether the Discretionary Criminal History Disqualification System violates this subclass of children's procedural due process rights under the Fourteenth Amendment to the United States Constitution.

241.  Questions of fact common to the SCR Disqualification Subclass include, but are not limited to:

a.  Whether the SCR Disqualification System denies this subclass of children kin foster or adoptive placements by giving undue weight to the Kin Caregiver's or adult household member's SCR record.

b. Whether the SCR Disqualification System denies this subclass of children notice and an opportunity to challenge denials of foster or adoptive placements with Kin Caregivers.

242. Questions of law common to the SCR Disqualification Subclass include, but are not limited to:

a. Whether the SCR Disqualification System violates this subclass of children's procedural due process rights under the Fourteenth Amendment to the United States Constitution.

243. The Named Plaintiffs' claims are typical of the claims of other members of the Plaintiff Class as all class members are similarly affected by Defendants' policies and practices in violation of the federal constitution.

244. Named Plaintiffs will fairly and adequately protect the interests of all members of the Plaintiff Class that they seek to represent.

245. Each Named Plaintiff appears by a next friend pursuant to Federal Rule of Civil Procedure 17(c), and each next friend is sufficiently familiar with the facts of the child's situation and dedicated to the child's best interests to fairly and adequately represent the child's interests in this litigation.

246. A class action is the superior method for a fair and efficient adjudication of this matter because Defendants have acted or failed to act on grounds generally applicable to all members of the Plaintiff Class, necessitating class-wide declaratory and injunctive relief. Counsel for Plaintiffs knows of no conflict among the Class members.

247.     Named Plaintiffs and the Plaintiff Class are represented by The Legal Aid Society and Dechert LLP, counsel who are together competent and experienced in child welfare litigation, class action litigation, and complex civil litigation.

248.     Counsel for Named Plaintiffs have identified and thoroughly investigated all claims in this action and have committed sufficient resources to represent the Plaintiff Class through trial and any appeals.

## CAUSES OF ACTION

### First Cause of Action

(Substantive Due Process Under the Fourteenth Amendment to the United States Constitution)
(Asserted by All Named Plaintiffs and the Plaintiff Class Against All Defendants)

249.     Paragraphs 1 – 248 above are repeated and re-alleged as if fully set forth herein.

250.     When Defendants remove a member of the Plaintiff Class from its parents, they assume an affirmative duty under the Fourteenth Amendment to protect that child from harm and risk of harm.

251.     By the foregoing actions and inactions, Defendants have acted under color of state law to violate this duty to all Named Plaintiffs and the Plaintiff Class.

252.     The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgement and amounts to deliberate indifference and conscience-shocking violation of Named Plaintiffs' and the Plaintiff Class's constitutional rights.

253.     As a result of Defendants' conduct, all Named Plaintiffs and Plaintiff Class members have been deprived or have been or are at an unreasonable risk of being deprived of their right to family integrity and association, of their right to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and of their right

to be under governmental care or supervision no longer than is necessary, as conferred on them by the Fourteenth Amendment to the United States Constitution.

## Second Cause of Action

(Substantive Due Process Under the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs B.B., J.R., R. Children and the Mandatory Disqualification Subclass Against All Defendants)

254. Paragraphs 1 – 248 above are repeated and re-alleged as if fully set forth herein.

255. When Defendants remove a member of the Plaintiff Class from its parents, they assume an affirmative duty under the Fourteenth Amendment to protect that child from harm and risk of harm.

256. By the foregoing actions and inactions, Defendants have acted under color of state law to violate this duty to Named Plaintiffs B.B., J.R., R. Children and all members of the Mandatory Disqualification Subclass.

257. The foregoing actions and inactions of Defendants amount to a policy, pattern, practice or custom that is inconsistent with the exercise of professional judgment and amounts to deliberate indifference and conscience-shocking violation of Named Plaintiffs' and Mandatory Disqualification Subclass's constitutional rights.

258. As a result of Defendants' conduct, Named Plaintiffs B.B., J.R., R. Children and the Mandatory Disqualification Subclass have been deprived or are at an unreasonable risk of being deprived of their right to family integrity and association, of their right to be free from unnecessary and unreasonable intrusion into their mental and emotional stability and well-being, and of their right to be under governmental care or supervision no longer than is necessary, as conferred on them by the Fourteenth Amendments to the United States Constitution.

## Third Cause of Action

(Procedural Due Process under the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs B.B., J.R., R. Children and the Mandatory Disqualification
Subclass Against All Defendants)

259.    Paragraphs 1 – 248 above are repeated and re-alleged as if fully set forth herein.

260.    By the foregoing actions and inactions, the Defendants have acted under color of

state law to violate the due process rights of Named Plaintiffs B.B., J.R., R. Children and all

members of the Mandatory Disqualification Subclass.

261.    Defendants' Mandatory Disqualification System constitutes a policy, pattern,

custom and practice that denies Named Plaintiffs B.B., J.R., R. Children and the Mandatory

Disqualification Subclass of foster or adoptive placement with Kin Caregivers without due

process, including notice of a denial of their right and a meaningful opportunity to be heard, in

violation of the Due Process Clause of the Fourteenth Amendment.

## Fourth Cause of Action

(Procedural Due Process under the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs Z.W. and D.W., C.P., C.C., J.S. and S.S. and the Discretionary
Criminal History Disqualification Subclass Against All Defendants)

262.    Paragraphs 1 – 248 above are repeated and re-alleged as if fully set forth herein.

263.    By the foregoing actions and inactions, City Defendants have acted under color of

state law to violate the due process rights of Named Plaintiffs Z.W. and D.W., C.P., C.C., J.S.

and S.S. and all members of the Discretionary Criminal History Disqualification Subclass.

264.    Defendants' Discretionary Criminal Disqualification System constitutes a policy,

pattern, custom and practice that denies Named Plaintiffs Z.W. and D.W., C.P., C.C., J.S. and

S.S. and the Discretionary Criminal History Disqualification Subclass of foster or adoptive

placement with Kin Caregivers without due process, including notice of a denial of their right

and a meaningful opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.

## Fifth Cause of Action

(Procedural Due Process under the Fourteenth Amendment to the United States Constitution)
(Asserted by Named Plaintiffs T.R., M.P., C.W.C., C.C., J.S. and S.S., R. Children and the SCR Disqualification Subclass Against All Defendants)

265. Paragraphs 1 – 248 above are repeated and re-alleged as if fully set forth herein.

266. By the foregoing actions and inactions, City Defendants have acted under color of state law to violate the due process rights of Named Plaintiffs T.R., M.P., C.W.C., C.C., J.S. and S.S., R. Children and all members of the SCR Disqualification Subclass.

267. Defendants' SCR Disqualification System constitutes a policy, pattern, custom and practice that denies Named Plaintiffs T.R., M.P., C.W.C., C.C., J.S. and S.S., R. Children and the SCR Disqualification Subclass of foster or adoptive placement with Kin Caregivers without due process, including notice of a denial of their right and a meaningful opportunity to be heard, in violation of the Due Process Clause of the Fourteenth Amendment.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Class respectfully request that this Honorable Court:

   a.  Assert jurisdiction over this action;

   b.  Certify that this action may be maintained as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure;

   c.  Declare unconstitutional and unlawful pursuant to Rule 57 of the Federal Rules of Civil Procedure:

      i.  New York Social Services Law § 378-a(2)(e)(1);

ii. 18 N.Y.C.R.R §§ 443.2(b); 443.8(e); 421.15; 421.16(n) to the extent that it permits Defendants to deny the Plaintiff Class kinship foster or adoptive placements without due process of law;

iii. Defendants' violation of the Plaintiff Class's right to be free from harm under the Fourteenth Amendments to the United States Constitution;

iv. Defendants' violation of the Plaintiff Class's substantive due process rights to under the Fourteenth Amendments to the United States Constitution;

v. Defendants' violation of the Plaintiff Class's procedural due process rights under the Fourteenth Amendments to the United States Constitution.

a. Enter a permanent injunction requiring:

i. Defendants to establish and implement practices to ensure the Plaintiff Class are provided with a meaningful and individualized evaluation of whether placement in a foster or adoptive home with a Kin Caregiver is safe and certify or approve and place the Plaintiff Class with kin foster or adoptive Kin Caregivers when it is safe, regardless of the criminal history or SCR record of the Kin Caregiver or household member;

ii. Defendants to establish and implement guidance and oversight over the foster and adoptive approval process to ensure its staff and agents are appropriately evaluating and fully considering a child's

Kin Caregiver when that Kin Caregiver or household member has a criminal or SCR record;

iii. Defendants to establish and implement practices to ensure the Plaintiff Class are provided with notice and a meaningful opportunity to challenge any determination denying their foster or adoptive placement on the basis of the criminal history or SCR record of the Kin Caregiver or household member.

b. Award the Plaintiff Class the reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees, pursuant to 28 U.S.C. § 1920, 42 U.S.C. § 1988, and Federal Rules of Civil Procedure 23(e) and (h); and

c. Grant such other and further equitable relief as the Court deems just, necessary, and proper to protect the Plaintiff Class from further harm by Defendants.

Dated: New York, New York
November 10, 2021

Respectfully submitted,

THE LEGAL AID SOCIETY

By: _/s/ Lisa Freeman_____
Lisa Freeman
Kathryn Wood

199 Water Street
New York, NY 10038
Phone: (212) 577-3300
lafreeman@legal-aid.org
kwood@legal-aid.org

and

DECHERT LLP

By:   /s/ Linda C. Goldstein
        Linda C. Goldstein
        Samantha Rosa

Three Bryant Park
1095 Avenue of the Americas
New York, New York 10036
Phone: (212) 698-3500
linda.goldstein@dechert.com
samantha.rosa@dechert.com