UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| B.B., a minor, by his Next Friend Joy Rosenthal; T.R., a minor, by his Next Friend Cynthia Godsoe; M.P., a minor, by his Next Friend Adira Hulkower; Z.W. and D.W., minors, by their Next Friend Jennifer Melnick; C.W.C., a minor, by her Next Friend Joy Rosenthal; J.R., a minor, by his Next Friend Anna Roberts; J.S. and S.S., minors, by their Next Friend Lisa Hoyes; C.P., a minor, by his Next Friend Cynthia Godsoe; C.C., a minor, by her Next Friend, Lisa Hoyes; and E.R., A.R. and M.R., minors, by their Next Friend Peggy Cooper Davis; on behalf of themselves and all other similarly situated youth,<br><br>　　　　　　　　　　　　　Plaintiffs,<br><br>　　　　　v.<br><br>KATHY HOCHUL, in her official capacity as Governor of the State of New York; SHEILA J. POOLE, in her official capacity as Commissioner of the New York State Office of Children and Family Services; and CITY OF NEW YORK,<br><br>　　　　　　　　　　　　　Defendants. | **MEMORANDUM AND ORDER**<br><br>21-cv-6229 (LDH) (RML) |

LASHANN DEARCY HALL, United States District Judge:

B.B., T.R., M.P., Z.W., D.W., C.W.C., J.R., J.S., S.S., C.P., C.C., E.R., A.R., and M.R.

("Plaintiffs"), individually and on behalf of others similarly situated, bring the instant action

against Kathy Hochul, in her capacity as Governor of the State of New York, Sheila J. Poole, in

her capacity as Commissioner of New York State's Office of Children and Family Services, and

the City of New York (collectively "Defendants"), asserting violations of their substantive and

procedural due process rights under the Fourteenth Amendment of the United States

Constitution.  Defendants move pursuant to Rules 12(b)(1), 12(b)(6) and 12(b)(7) of the Federal

Rules of Civil Procedure to dismiss the complaint in its entirety.

# BACKGROUND[1]

## I.    Disqualification Systems

The Office of Children and Family Services ("OCFS") and the Administration for Children's Services ("ACS") are state government agencies that provide child welfare, juvenile justice and early care and education services, with the goal of protecting and promoting the safety and well-being of New York City children and families.  Each year, ACS removes thousands of children from their parents or guardians in New York City based on allegations of abuse or neglect.  (Compl. ¶ 4, ECF No. 1.)  Once removed, children are placed into ACS custody.  (*Id.*)  Thereafter, ACS must notify each child's potential "kin"[2] to set out the options for the child's care.  (*Id.* ¶ 157.)  Among other alternatives, the child's kin may seek to become certified as a foster parent or approved as an adoptive parent.  (*Id.* ¶ 158.)  In connection with both the foster parent and adoption approval processes, ACS collects information about the applicant to determine his or her suitability for certification or approval.  (*Id.* ¶ 159.)  Of particular relevance here, ACS requests fingerprints and records from the New York State Central Register of Child Abuse and Maltreatment ("SCR") on the applicant and any other adult who resides in the same household.  (*Id.* ¶¶ 13, 159.)  SCR is a registry of individuals who have been investigated for child abuse or neglect, and is maintained by OCFS.  (*Id.* ¶ 13.)  Once ACS receives fingerprints and records on the applicant, this information is then submitted to OCFS, which in turn requests a criminal history check from the New York State Division of Criminal Justice Services and the Federal Bureau of Investigation.  (*Id.* ¶ 159.)  OCFS then provides ACS

---

[1] The following facts taken from the complaint (Compl. ECF No. 1) are assumed to be true for the purpose of deciding the instant motion.

[2] Kin is defined under state law as "any individual related to a half-sibling of the child through blood, marriage or adoption, and where such person is also the prospective or appointed relative guardian of such half-sibling *or* an adult with a pre-existing positive relationship with the child including, but not limited to, a step-parent, godparent, neighbor or family friend."  (Compl. ¶ 156 n.4.)

with a summary of the applicant's criminal history and notifies ACS as to whether the application should be denied, held in abeyance, or proceed.  (*Id*. ¶ 160.)

 An applicant can be denied certification as a foster parent or approval as an adoptive parent under any one of three state disqualification systems:  (1) mandatory disqualification system, (2) discretionary criminal history disqualification system; or (3) SCR disqualification. (*Id*. ¶¶ 11–13.)  With respect to mandatory disqualification, pursuant to New York Social Services Law ("NYSSL") § 378-a-(2)(e)(1), applicants who have been convicted of certain enumerated felonies are ineligible for certification as a foster parent or approval as an adoptive parent.  (*Id*. ¶ 165.)  Specifically, the law provides that:

> "an application for certification or approval of a prospective foster parent or prospective adoptive parent shall be denied and . . . an agreement to provide payments to a prospective successor guardian . . . shall not be approved . . . where a criminal history record of the [applicant] . . . reveals a conviction for: (A) a felony conviction at any time involving: (i) child abuse or neglect; (ii) spousal abuse; (iii) a crime against a child, including child pornography; or (iv) a crime involving violence, including rape, sexual assault, or homicide, other than a crime involving physical assault or battery; or (B) a felony conviction within the past five years for physical assault, battery, or a drug related offence[.]"

(*Id*. ¶ 166 (citing NYSSL § 378-a-(2)(e)(1)).)  According to the complaint, OCFS has designated nearly 300 felonies that trigger lifetime mandatory disqualification.  (*Id*. ¶ 167.)

Even where an applicant is not disqualified under the mandatory disqualification system, an application for approval of a prospective foster or adoptive parent may be denied at the discretion of ACS if the applicant, or any person over the age of 18 residing with the applicant, has a criminal charge or conviction.  (*Id.* ¶ 172.)  Neither OCFS nor ACS provides guidance as to how ACS should appropriately exercise its discretion in determining who should be disqualified discretionally.  (*Id*. ¶ 174.)  OCFS does, however, require ACS to provide an applicant with written notice setting forth the basis for any disqualification and must offer to meet with the

applicant.  (*Id*. ¶ 175.)  An applicant can also be disqualified if he or she is over 18 and was the subject of an "indicated report" in the New York State Central Register of Child Abuse and Maltreatment, where the applicant was investigated for child abuse or neglect.  (*Id*. ¶ 13.)

If an applicant is disqualified from being certified as a foster parent or approved as an adoptive parent, ACS may nonetheless permit the child to be directly placed with the applicant or "Kin Caregiver."  (*Id*. ¶ 16.)  Since 2012, at least 16,000 children across New York State have been diverted from foster care through direct placement with Kin Caregivers.  (*Id*. ¶ 191.)  Direct placement is temporary and the child remains at risk of being placed with a stranger or in a group care setting.  (*Id*. ¶ 15.)  Kin Caregivers who are disqualified from being certified as a foster or adoptive parent are ineligible to receive Childcare Services and Supports.  (*Id*. ¶¶ 16, 192, 195.)  Supports include maintenance payments intended to reimburse the family for the cost of caring for the child and various allowances that benefit the child, such as funds for transportation, clothing, school related expenses, and miscellaneous expenses.  (*Id*. ¶ 161.)  Typical services include coordination and provision of services for the child's medical, mental health, and scholastic needs, and training to assist in providing the proper care for the child.  (*Id*.)  Additionally, children in foster care are automatically eligible for Medicaid.  (*Id*. ¶ 162.)  If a Kin Caregiver is approved as an adoptive parent, the Kin Caregiver receives an adoption subsidy, caseworker supervision during the adoption process, and post-adoption services, including counseling, caregiver training, clinical and consultative services, and access to community support services.  (*Id*. ¶ 163.)  Adoptive parents are also eligible for an adoption tax credit.  (*Id*.)

## II.   The Plaintiffs

### A.  B.B.

In February 2018, ACS removed B.B. from his mother's care.  (Compl. ¶ 22.)  Once

removed, B.B. was immediately released to his maternal great grandparents, Mr. and Mrs. R.

(*Id.*)  In September 2019, Mr. and Mrs. R requested to be certified as foster parents, and ACS

commenced the foster care certification process two months thereafter.  (*Id.* ¶¶ 22, 26.)

However, in April 2020, ACS informed Mr. and Mrs. R that as a result of a 25-year-old

conviction for attempted burglary in the second degree, Mr. R was mandatorily disqualified from

being certified as a foster parent.  (*Id.* ¶¶ 27, 28, 36.)  As a result, Mr. and Mrs. R were informed

that B.B. would be removed from the home in June 2020.  (*Id.* ¶ 27.)  B.B. continues to reside

with Mr. and Mrs. R, who, according to ACS, meets all of B.B.'s "medical, emotional, and

physical needs."  (*Id.* ¶¶ 23–24, 27.)  Because Mr. and Mrs. R are on a fixed income and at times

are short on their monthly bills, the family desperately needs Childcare Support and Services.

(*Id.* ¶ 37.)

### B.  T.R.

In January 2021, ACS removed T.R. from his biological parents.  (Compl. ¶ 39.)  T.R.

was placed in a youth reception center and then in a foster home.  (*Id.*)  At the time of T.R.'s

removal, T.R.'s maternal grandmother, Ms. K expressed an interest in caring for T.R.  (*Id.*

¶¶ 40–41.)  In January 2021, ACS reported that it would not certify Ms. K as a foster parent for

T.R., due to a 2001 incident reflected on Ms. K's SCR report, and three Domestic Incident

Reports ("DIR").  (*Id.* ¶ 42.)  Sometime after Ms. K was denied foster parent certification, T.R.

was directly placed with Ms. K.  (*Id.* ¶ 44.)  T.R. continues to reside with Ms. K, his uncle, and

cousin.  (*Id.* ¶ 47.)  Without Childcare Supports and Services, Ms. K struggles financially to care

for T.R. and lives in fear that T.R. will be removed from her care at any time.  (*Id.* ¶¶ 45–46, 48.)

### C.  Z.W. and D.W.

In August 2019, ACS removed Z.W. and D.W. from their parents' home.  (Compl. ¶ 61.)
Once removed, Z.W. and D.W. were directly placed with their maternal uncle, Mr. P, and his
partner, Ms. G.  (*Id.*)  Mr. P immediately sought foster parent certification for Z.W. and D.W.
(*Id.* ¶ 64.)  However, ACS refused to evaluate Mr. P for foster parent certification because of a
May 2019 charge for Driving Under the Influence.  (*Id.* ¶¶ 64–65.)  Z.W. and D.W. continue to
reside with Mr. P. and Ms. G.  (*Id.* ¶ 66.)  ACS reported that Z.W. and D.W. were "bonded and
comfortable" with Mr. P and Ms. G and there were no reported "safety factors."  (*Id.*)  Mr. P. and
Ms. G are struggling financially while caring for Z.W. and D.W.  (*Id.* ¶¶ 68–69.)  Because direct
placement is not a permanent placement, the family also worries whether Z.W. and D.W. will
remain in their care.  (*Id.* ¶ 71.)

### D.  C.W.C.

In August 2020, ACS removed C.W.C. from her mother's care and was immediately
placed with her maternal grandmother, Mrs. G.  (Compl. ¶ 73.)  Mrs. G. sought foster parent
certification for C.W.C., but ACS determined that Mrs. G. could not be certified because a child
was alleged to have been injured in her home when she previously served as a foster parent.  (*Id.*
¶ 78.)  Mrs. G. received a letter in March 2021 indicating that the allegation of the foster child's
injury was unfounded.  (*Id.* ¶ 79.)  C.W.C.'s placement was converted to a direct placement with
Mrs. G, with whom she continues to reside.  (*Id.* ¶¶ 80–81.)  Mrs. G. is on a fixed income and
without the much-needed Childcare Supports and Services, the family worries that C.W.C. will
be removed from their care.  (*Id.* ¶¶ 80–81.)

### E.  J.S. and S.S.

In March 2018, ACS removed J.S. from his parents.  (Compl. ¶ 94.)  ACS immediately
placed J.S., and his younger sibling when she was born in April 2018, with their maternal

grandmother, Ms. S.  (*Id.* ¶¶ 94, 96.)  In June 2019, ACS informed Ms. S. that she could not be certified as a foster parent because of her criminal history dating back to the 1980s and early 1990s, as well as an indication on her SCR report.  (*Id.* ¶¶ 96–97.)  Caring for J.S. and S.S. has placed significant financial stress on the family because Ms. S. remains ineligible for Childcare Services and Supports.  (*Id.* ¶¶ 98, 100.)

**F.  C.C.**

In October 2020, C.C. was removed from her mother's care.  (Compl. ¶ 112.)  Once removed, C.C. was placed with her stepfather until June 2021 when he could no longer care for her.  (*Id.*)  ACS then placed C.C. with her aunt and uncle.  (*Id.*)  Thereafter, C.C.'s aunt and uncle sought foster parent certification.  (*Id.* ¶ 116.)  ACS denied their certification based on C.C.'s aunt's 1996 drug-related conviction and an SCR record from a decade earlier related to an incident between a foster child and C.C.'s aunt's ex-husband.  (*Id.*)  Nonetheless, ACS directly placed C.C. with her aunt and uncle, where she continues to reside.  (*Id.* ¶¶ 114, 117.)  ACS has reported that C.C. is happy with the placement.  (*Id.* ¶ 114.)  C.C.'s aunt and uncle struggle to manage the needs of the household while caring for C.C., particularly without Childcare Services and Supports.  (*Id.*  ¶ 117.)  C.C. worries about her placement and the family also worries that C.C. will run away if ACS removes her from their home.  (*Id.* ¶ 119.)

**G.  E.R., A.R. and M.R.**

In October 2020, ACS removed E.R., A.R. and M.R. (the "R. Children") from their mother's care.  (Compl. ¶ 121.)  Once removed, E.R.'s, A.R.'s and M.R.'s maternal grandmother, Ms. G., requested that ACS place them with her, which it did.  (*Id.* ¶¶ 121, 125.)  At the time, Ms. G. informed ACS that it would be difficult for her to "stretch" her existing resources to care for three young children.  (*Id.* ¶ 122.)  In October 2020, ACS commenced the foster parent certification process for Ms. G.  (*Id.* ¶ 123.)  During the process, Ms. G. was

forthcoming about her criminal history and a prior child welfare investigation. (*Id.*) Specifically, in 2008, Ms. G. pleaded guilty to a 2008 robbery charge and served six months in prison. (*Id*) While Ms. G. was incarcerated, ACS also opened an investigation into Ms. G. after receiving a report of child neglect. (*Id.* ¶ 124.) The case was later dismissed in family court. (*Id.*) In December 2020, ACS informed the family that it would not certify Ms. G. as a foster parent for E.R., A.R. and M.R. because of her criminal conviction and SCR record. (*Id.* ¶ 125.) E.R., A.R. and M.R. were then directly placed with Ms. G. (*Id.* ¶ 126.) The family struggles financially to care for E.R., A.R. and M.R. because Ms. G. remains out of work after losing her job. (*Id.* ¶¶ 128–129.) Without Childcare Supports and Services, E.R.'s, A.R.'s and M.R.'s placement with Ms. G. is at risk. (*Id.* ¶ 131.)

### H.  M.P.

In December 2018, ACS removed M.P. from his father's home. (Compl. ¶ 50.) Once removed, ACS placed M.P. with Ms. M., his father's cousin. (*Id.* ¶ 51.) In February 2019, ACS placed M.P. at Geller House, a Rapid Intervention Center, for assessment. (*Id.* ¶ 52.) In May 2019, ACS moved M.P. to the Children's Village, a Residential Treatment Center ("RTC"). (*Id.*) After ten days at the RTC, M.P. left the facility and went to Ms. M.'s home, and Ms. M. proceeded with the foster parent certification process. (*Id*.) In January 2020, ACS informed Ms. M. that it would not certify her as a foster parent for M.P. because of a single SCR record for "Inadequate Guardianship" from a decade earlier when Ms. M. was a foster parent. (*Id.* ¶ 55.) Once Ms. M. was denied foster parent certification, ACS allowed M.P. to be placed with Ms. M. as an "extended visit," and ACS reported that Ms. M. continued to provide M.P. with "structure and guidance." (*Id.* ¶ 56–57.) In the fall of 2020, Ms. M. struggled to care for M.P., and without Childcare Supports and Services, M.P.'s behavioral needs became difficult to manage. (*Id.* ¶

58.)  ACS removed M.P. from Ms. M.'s home in December 2020 and again placed him at the RTC.  (*Id.* ¶ 58.)

### I.   J.R.

In August 2017, ACS removed J.R. from his father's home.  (Compl. ¶ 83.)  Once removed, ACS placed J.R. at a large shelter in Manhattan until moving him to a foster home.  (*Id.*)  Since that placement, J.R. has moved into different homes at least six times.  (*Id.* ¶ 85.)  In December 2019, ACS placed J.R. with his paternal grandmother, Ms. V, and her husband.  (*Id.* ¶ 86.)  J.R. previously lived with Ms. V. for three months until a medical issue temporarily prevented her from caring for him.  (*Id.*)  Once Ms. V recovered, she sought foster parent certification.  (*Id.*)  ACS denied Ms. V foster parent certification because her husband had a 30-year-old conviction for robbery in the second degree, a mandatory disqualifying offense.  (*Id.* ¶ 88.)  In February 2020, ACS removed J.R. and placed him in a foster home, and in January 2021, J.R. was placed in another foster home.  (*Id.* ¶¶ 88, 92.)

### J.   C.P.

In October 2020, C.P. and his three younger siblings were removed from their mother's care.  (Compl. ¶ 103.)  Once removed, ACS placed them at the Children's Center, a large shelter in Manhattan.  (*Id.* ¶ 105.)  At the time of removal, C.P. asked to be placed with his uncle, Mr. P.  (*Id.* ¶¶ 104–105.)  Mr. P immediately offered to become a foster parent for C.P.  (*Id.* ¶ 103.)  Initially, an ACS caseworker visited Mr. P's home to discuss certification and informed him that he was cleared.  (*Id.* ¶ 105.)  Mr. P then began preparing for C.P.  (*Id.*)  However, after two weeks, ACS refused to certify Mr. P as a foster parent because of a prior misdemeanor conviction from 2017 for Driving Under the Influence.  (*Id.* ¶ 106.)  ACS, in its discretion, also refused to place C.P. with Mr. P.  (*Id.*)  Three weeks after being placed in the Children's Center, C.P. and his siblings were moved into two separate foster homes.  (*Id.* ¶ 110.)  At the time the

complaint was filed on November 10, 2021, there are no allegations that C.P. ever resided with Mr. P.  (*Id.* ¶¶ 103–111.)

## STANDARD OF REVIEW

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).  The plaintiff bears the burden of establishing beyond a preponderance of the evidence that subject-matter jurisdiction exists.  *Id.*  "In reviewing a Rule 12(b)(1) motion to dismiss, the court 'must accept as true all material factual allegations in the Complaint, but [the court is] not to draw inferences from the complaint favorable to plaintiff[ ].'" *Tiraco v. New York State Bd. of Elections*, 963 F. Supp. 2d 184, 190 (E.D.N.Y. 2013) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).  Further, "[i]n resolving a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), a district court . . . may refer to evidence outside the pleadings." *Makarova*, 201 F.3d at 113.

## DISCUSSION

I.      **Rule 12(b)(1) Motion**

    **A.  Article III Standing**

"No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies.  The concept of standing is part of this limitation." *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 37, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976) (citation omitted).  At the pleading stage, elements of Article III standing are not "mere pleading requirements but rather an indispensable part of the plaintiff's case," and "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof." *Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 56 (2d Cir. 2016) (citation omitted.)  Specifically, a plaintiff

must plead to have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged

conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."

*Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S.

555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)).  Of course, "general factual allegations

of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we

presume that general allegations embrace those specific facts that are necessary to support the

claim."  *Id.* (citation omitted).  And while the Court must accept the truth of a plaintiff's

allegations at the motion to dismiss stage, the plaintiff still bears the burden of alleging facts that

affirmatively and plausibly suggest that [the plaintiff] has standing to sue.  *See Calcano v.*

*Swarovski North America Ltd.*, 36 F.4th 68, 75 (2d Cir. 2022) (citations omitted.)

Plaintiffs maintain that they suffered injuries resulting from the alleged violations of three

constitutional rights arising under the Fourteenth Amendment:  the right to family association

and integrity; the right to be free from unreasonable and unnecessary intrusions into their

emotional well-being; and the right to not be maintained in government custody longer than is

necessary, including unreasonable duration of foster care.  (Compl. ¶ 19.)  In seeking to dismiss

the complaint, Defendants contend that Plaintiffs fail to establish standing.  (Defs.' Mem. Supp.

Mot. to Dismiss ("Defs.' Mem.") at 8–9, ECF No. 25.)  The Court agrees.

    1.   <u>Constitutional Right to Family Association and Integrity</u>

"Freedom of personal choice in matters of . . . family life is one of the liberties protected

by the Due Process Clause of the Fourteenth Amendment."  *Smith v. Org. of Foster Families For*

*Equal. & Reform*, 431 U.S. 816, 842 (1977) (internal quotation marks omitted).  Indeed, this

Court has previously concluded that there are few rights more paramount than the right to the

preservation of family integrity.  *See Alford v. City of New York*, 413 F. Supp. 3d 99, 106

(E.D.N.Y. 2018) (finding that the rights for a child to remain in parental custody and to preserve family integrity are "paramount.")).  Of particular relevance here, this right extends not only to a parent and a child, but also to foster parents and their foster children.  *See Rivera v. Marcus*, 696 F.2d 1016, 1022, 1025 (2d Cir. 1982) (finding that a custodial relative and foster parent is entitled to due process protections "when the state decides to remove a dependent relative from the family environment."); *see also Sykes v. New York State Office of Children and Family Services*, No. 18-cv-8309, 2019 WL 4688608, at *11 (S.D.N.Y. Sept. 25, 2019) (stating that "it has been clear in this Circuit that kinship foster parents—that is, foster parents who are related to their foster children—are entitled to due process protection before foster children are removed from their custody.")  Importantly, in this context, the liberty interest in the right to family association is implicated only where the government seeks to remove a child from their familial association and deprive the parent of their interest in the care, custody and management of the child.  *Kia P. v. McIntyre*, 235 F.3d 749, 759 (2d Cir. 2000) ("For purposes of procedural due process analysis, parents have 'a constitutionally protected liberty interest in the care, custody and management of their children,'" and "children have a parallel constitutionally protected liberty interest in not being dislocated from the emotional attachments that derive from the intimacy of daily [family] association.") (internal quotation marks omitted).

Here, Defendants argue that B.B., T.R., Z.W., D.W., C.W.C., J.S., S.S., C.C., E.R., A.R. and M.R., ("Directly Placed Plaintiffs"), failed to plead an injury to their right to family association and integrity because each of these Plaintiffs is alleged to reside with a Kin Caregiver.  That is, according to the complaint, B.B. resides with his maternal great grandparents.  (Compl. ¶¶ 22–24.)  T.R. resides with his maternal grandmother and uncle.  (*Id.* ¶ 40.)  Z.W. and D.W reside with their maternal uncle.  (*Id.* ¶ 61–62.)  C.W.C resides with her

maternal grandmother.  (*Id.* ¶ 73–75, 80.)  J.S. and S.S. reside with their maternal grandmother.

(*Id.* ¶ 94–95.)  C.C. resides with her aunt and uncle.  (*Id.* ¶ 112–13, 119.)  And, E.R., A.R. and

M.R., reside with their maternal grandmother.  (*Id.* ¶ 121–22, 131.)  As such, there can be no

deprivation of the Kin Caregiver's interest in the care, custody and management of the children.

Incredibly, Plaintiffs fail altogether to address Defendants' argument.[3]  Instead, Plaintiffs

assert in summary fashion:

> "Here[,] Plaintiffs allege a concrete and actual injury in fact that is directly caused by
> Defendants' unconstitutional certification system that routinely denies children placement
> in familiar, safe[,] and loving foster or adoptive homes of relatives solely based on
> irrelevant aspects of their relatives' past.  The denial of kin foster or adoptive home
> constitutes a concrete and particular injury."

(Pls.' Mem. L. in Opp'n to Defs.' Mot. Dismiss ("Pls.' Opp'n") at 6, ECF No. 28.)  Of course,

nothing in that assertion addresses how the right to familial association is implicated in the cases

of the Directly Placed Plaintiffs who each reside with a relative.  That said, the Directly Placed

Plaintiffs do argue that they are at an ongoing risk of placement in stranger foster care.  (*Id.*)

And, while an injury-in-fact requires a plaintiff to show that he or she suffered an invasion of a

legally protected interest that is concrete and particularized, Plaintiffs correctly note that a

constitutional injury may arise by an unreasonable risk of harm.  *See Lacewell v. Office of*

*Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) ("An allegation of future injury may

suffice if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the

harm will occur") (citations omitted).  Still, any injury must be "actual or imminent," not

"conjectural or hypothetical."  *Lawyers' Committee for 9/11 Inquiry, Inc. v. Garland*, 43 F.4th

276, 281 (2d Cir. 2022) ("To demonstrate Article III standing, a plaintiff must show that he

---

[3] Because Plaintiffs did not address this argument in their opposition, this argument can be deemed abandoned.  *See,*
*e.g.*, *Spinnato v. Unity of Omaha Life Ins. Co.*, 322 F. Supp. 3d 377, 405 (E.D.N.Y. 2018) ("A district court 'may,
and generally will, deem a claim abandoned when a plaintiff fails to respond to a defendant's arguments that the
claim should be dismissed.'") (citations omitted).

suffered an 'injury in fact'—'an invasion of a legally protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical.'").

Here, the complaint is devoid of any allegation that might suggest there is an imminent risk that the Directly Placed Plaintiffs will be removed from their current kinship placement. That Plaintiffs have characterized their direct placement as "temporary" is insufficient to make the requisite showing.  (Compl. ¶ 71.)  For example, B.B. has resided with his maternal grandparents since 2018 – over five years – and there is no allegation that suggests that this custodial placement is poised to change.  (*Id*. ¶¶ 22–37.)[4]  In March 2018, J.S. was removed from his parents care and was "immediately" placed in the care of his maternal grandmother, Ms. S. (*Id.* ¶ 94.)  One month later, in April 2018, J.S.'s younger sister was born and she, too, was immediately placed in the care of Ms. S.  (*Id.*)  To date, J.S. and S.S. have remained in the care of Ms. S, no less than at least five years.  (*Id.* ¶ 99.)  Here again, Plaintiffs do not include any allegation suggesting that ACS might immediately remove either J.S. or S.S. from Ms. S's care. To the contrary, the allegations suggest that the expectation is for their placement with Ms. S to continue into the future.  (*Id.* ¶¶ 100–101.)  That is, it is alleged that Ms. S has the very real concern that she may not be able to retire if she must care for J.S. and S.S. without support or services from ACS.  (*Id.* ¶100.)  Z.W. and D.W. have been placed with the with their maternal uncle for over two years.  (*Id.* ¶ 61.)  There, the "children are thriving in their care," and ACS reported that "the children are 'bonded and comfortable' with their uncle and his partner."  (*Id.* ¶ 62, 66.)  The Court could go on.  In sum, nothing about Plaintiffs' allegations allow for the inference that any of the Directly Placed Plaintiffs is laboring under an actual or imminent threat

---

[4] Plaintiff B.B. alleges that after ACS denied his maternal grandparents foster parent certification in April 2020, ACS also informed the family that B.B. would be removed from the home in June 2020.  (Compl. ¶ 27.)  However, there are no allegations that ACS ever removed B.B. at that time or at any point thereafter.

of removal.  Directly Placed Plaintiffs lack standing to sue for a violation of the right to family association and integrity.

Although the standing analysis for J.R., M.P., and C.P. differs from that of the Directly Placed Plaintiffs, the outcome is the same.  Relying on a declaration from Cynthia Covington, the Acting Assistant Commissioner of Systems and Security Administration at ACS, and accompanying exhibits, Defendants argue that the Kin Caregivers for Plaintiffs M.P. and J.R. "voluntarily relinquish[ed]" custody over them, and that Plaintiff C.P. was never removed from his Kin Caregiver's home.  (Defs.' Mem. at 9–10; Cynthia Covington Declaration ("Covington Decl."), ECF No. 26.)  As such, according to Defendants, Plaintiffs have failed to adequately allege that any injury to their right to family association and integrity is fairly traceable to Defendants.  In response, Plaintiffs argue that it is inappropriate for Defendants to present extrinsic material on a Rule 12(b)(1) motion "if [] defendant[s] [are] challenging the legal sufficiency of []plaintiffs' jurisdictional allegations.  (Pls.' Opp'n at 3–4.)  While this may be true, it does not preclude the Court from considering extrinsic evidence here.  As Defendants correctly note, a defendant is permitted to rely on evidence outside of the pleadings, where, as here, they challenge the factual basis for the Court's jurisdiction.  *See Carter v. HealthPort Technologies, LLC*, 822 F.3d 47, 57 (2d Cir. 2016) ("[A] defendant is permitted to make a fact-based Rule 12(b)(1) motion, proffering evidence beyond the Pleading.")  In view of the evidence adduced by Defendants, it is clear that Plaintiffs have failed to allege an injury as to J.R., M.P., and C.P. that is fairly traceable to Defendants.

Traceability, in the context of a standing analysis, requires a demonstration of a "causal connection between the injury and the conduct complained of."  *See Lujan*, 504 U.S. at 560;  Put differently, the alleged injury must be "fairly … traceable to the challenged action of the

15

defendant, and not … the result of the independent action of some third party not before the court." *See Lujan*, 504 U.S. at 560 (citations omitted); *see also Chevron Corp. v. Donziger*, 833 F.3d 74, 121 (2d Cir. 2016) (holding that traceability "focuses on whether the asserted injury could have been a consequence of the defendant rather than being attributable to the 'independent' acts of some other person not before the court.")  A plaintiff cannot establish traceability if a plaintiff's injury stems from a voluntary decision that was not fairly traceable to a defendant's conduct. *See, e.g.*, *Holocombe v. Ingredients Solutions, Inc.*, 797 F. App'x 630, 633 (2d Cir. 2020) (summary order) (finding that plaintiff's injury stemmed from a voluntary decision and thus was not fairly traceable to defendants' alleged misconduct).  Such is the case here.

In a very carefully worded paragraph, Plaintiff M.P. alleges that:

"In the fall of 2020, Ms. M. began to really struggle to continue to care for M.P. Ms. M. was unable to work due to an injury, and without the Childcare Supports and Services that come with a foster care placement, some of M.P.'s behavioral needs became difficult to manage.  ACS removed M.P. from Ms. M's home [i]n December 2020 and placed him back at the RTC where he had felt unsafe."

(Compl. ¶ 58.)  As to J.R., Plaintiffs allege that he was placed with his paternal grandmother, Ms. V.  (*Id.* ¶ 86.)  According to the complaint, that placement was going so "smoothly and well" that ACS "started the process of withdrawing their petition to terminate J.R.'s father's parental rights because ACS was working toward KinGAP[5] with Ms. V. as J.R.'s permanency plan." (*Id.* ¶ 87.)  It was only upon Ms. V.'s denial of foster care certification that it is alleged that ACS "removed" J.R. from Ms. V.'s home.  (*Id.* ¶¶ 86, 88.)  Nonetheless, the complaint is deafeningly silent as to how or why J.R. and M.P. were removed.

---

[5] Under KinGAP, if a Kin Caregiver has been a child's foster parent for at least six months, a Kin Caregiver will be given the legal responsibility to care, control and supervise a child, and can receive a subsidy.  (Compl. ¶ 155.)

Plaintiff M.P.'s Kin Caregiver also voluntarily relinquished custody of M.P., once in 2018 and then again in 2020.  (Def. Mem. at 10.)  In December 2018, Plaintiff M.P. was placed with his Kin Caregiver, Ms. M.  (Compl. ¶ 51, Covington Decl. ¶¶ 20, 22, Ex. 6 at 12, ECF No. 32-6.)  According to ACS records, Ms. M decided that she could not care for him because she could not manage M.P.'s behavioral issues.  (Ex. 6 at 13.)  M.P. was placed at the Children's Village in May 2019 and then returned to Ms. M's home at an unspecified date.  (Compl. ¶ 52.)  ACS records indicate that in December 2020, Ms. M again requested that M.P. be removed from her home because he was breaking her furniture.  (Covington Decl., Ex. 8 at 78–79, 96–97, ECF No. 32-8.)  It was at that point that ACS removed M.P. from Ms. M.'s care.  (Compl. ¶ 58.)

However, as Ms. Covington's declaration makes clear, J.R.'s grandparents voluntarily returned J.R. to ACS's care.  J.R. was placed with his grandmother in November 2017.  (Covington Decl., Ex. 2 at 3, ECF No. 32-2.)  As ACS records reflect, in February 2018, J.R.'s grandmother returned J.R. to ACS because she was unable to care for him due to health issues.  (*Id*.)  In December 2019, J.R. was again placed on an extended visit with his paternal grandparents.  (Compl. ¶ 86; Ex. 2 at 10.)  But, two months later, in February 2020, J.R.'s paternal grandparents decided that J.R. should be removed from their home because they could not financially provide for him.  (Compl. ¶ 88; Ex. 2 at 10, 11; Ex. 3 at 4, 12, ECF No. 32-3.)

It is inescapable that both M.P. and J.R. were voluntarily relinquished from their Kin Caregivers' care.  Indeed, in response to Defendants' voluntary relinquishment argument, Plaintiffs cite to paragraphs 52, 58, 86, and 88 of the complaint to note that "[e]ach Kin caregiver applied to be a foster parent for their relative child and only after they were denied certification did *they* determine they were unable to care for that child."  (Pl.'s Opp'n at 6 n.5.)  In other words, Plaintiffs seem to agree.

Allegations with respect to Plaintiff C.P. fare no better.  According to the complaint, C.P. was removed from his mother in October 2020.  (Compl. ¶ 103.)  Plaintiffs do not challenge that removal.  C.P. was subsequently placed at a shelter and then in a foster home.  (*Id.* ¶¶ 103, 105.) Conspicuously absent is any allegation that C.P. ever resided with a Kin Caregiver and was removed at the direction of ACS.  On that basis alone, Plaintiffs fail to allege an injury to C.P.'s right to familial integrity.  Admittedly, Plaintiffs allege that C.P.'s uncle, Mr. P., offered to become foster parent but that ACS refused to certify Mr. P. because of a prior misdemeanor conviction.  (*Id.* ¶¶ 103, 106.)  As a result, according to the complaint, C.P is in a stranger foster home.  (*Id.* ¶ 103.)  As with M.P. and J.R., however, there are no allegations that permit the Court to infer that C.P's placement in stranger foster care versus (presumably) with his uncle can be attributed to conduct by Defendants.

Plaintiffs M.P., J.R., and C.P. fail to plead an injury to their right to family association and integrity.

## 2. Constitutional Right to Be Free from Harm

As courts in this Circuit have recognized, "under certain circumstances, the federal Constitution imposes upon the government an affirmative duty to provide services and care to individuals in state custody." *Marisol A. by Forbes v. Giuliani*, 929 F. Supp. 662, 674 (S.D.N.Y. 1996).  More to the point, under the Fourteenth Amendment, the Government must provide to those individuals in its custody "reasonably safe conditions of confinement and general freedom from undue bodily restraint."  *Id.*  This right to be "free from harm" reaches the right to "essentials of care such as adequate food, shelter, clothing and medical attention," and appropriate conditions and duration of foster care.  *Id.* at 675.  This right also includes the right to be free from psychological, emotional and developmental harm.  *Id.*  For example, one court reasoned:  "A child's physical and emotional wellbeing are equally important.  Children are by

their nature in a developmental phase of their lives and their exposure to traumatic experiences, can have an indelible effect upon their emotional and psychological development and cause more lasting damage than many strictly physical injuries." *B.H. v. Johnson*, 715 F. Supp. 1387, 1395 (N.D. Ill. 1989). The Court sees no basis for disagreeing with this thinking. Similarly, the Court is in agreement with those courts that have found that the right to be free from harm includes the right to an appropriate duration of foster care. *See, e.g.*, *Marisol*, 929 F. Supp. at 676 (stating that "the right to be free from harm encompasses the right alleged by plaintiffs to appropriate conditions and duration of foster care"). In other words, the Court joins its sister courts in taking a broad view of the concept of harm attendant to the right to be free from unreasonable intrusions into a child's emotional harm. But, the fact that the Court agrees with this broad view does not overcome the deficiencies raised by Defendants with respect to standing.

It is axiomatic that to find an injury to a right that relates to the conditions of an individual's confinement requires, as a condition precedent, that the individual actually be in custody. For that reason, perhaps, Defendants argue that none of the Directly Placed Plaintiffs have standing to sue for a violation of their right to be free from harm, because none of the Directly Placed Plaintiffs are in government custody. (Defs.' Mem. at 8.) Tellingly, Plaintiffs fail to direct the Court to any allegation that suggests the contrary. This failure is fatal to the Directly Placed Plaintiffs' claim that they have standing to sue for an injury to their right to be free from harm. Of course, given that M.P., J.R., and C.P. are alleged to be in state custody, their custodial status does not preclude a finding that they have standing to sue. Nonetheless, their claim of standing to sue for a violation of the right to be "free from harm" is otherwise infirmed.

Children in state custody have a right to conditions of confinement that bear a reasonable relationship to the purpose of their custody. *Marisol*, 929 F. Supp. at 676 ("Individuals in state

custody, however, do have a constitutional right to conditions of confinement which bear a reasonable relationship to the purpose of their custody) (citing *Jackson v. Indiana*, 406 U.S. 715, 738 (1972).)   And, as alleged by Plaintiffs, OCFS has stated that the "overarching goal for each child in [foster] care is to identify safe and suitable permanency options . . . within the context of safety and the child's best interests."  (Compl. ¶ 6.)  That said, as a matter of law, the right to be free from harm does not require that the government prove the least restrictive, optimal placement, or optimal level of treatment.  *Marisol*, 929 F. Supp. at 675 (collecting cases) ("Courts generally agree that the Fourteenth Amendment does not require the state to provide children in foster care with an optimal level of care or treatment" and thus "to the extent that custodial plaintiffs allege a substantive due process right to a least restrictive, optimal placement, their claims must be dismissed.")  Therefore, Plaintiffs must complain of more.  Here, they do not.

With respect to "stranger foster care," Plaintiffs allege generally that "social science data confirms that children placed with Kin Caregivers generally fare better than children placed with strangers."  (Compl. ¶ 8.)  Plaintiffs allege that children in stranger foster care "have poorer school performance and are more susceptible to homelessness, arrest, chemical dependency, and mental and physical illness than children who remain with their families."  (*Id.* ¶ 15.)  In addition, Plaintiffs allege that  the children in stranger foster care "experience approximately *three times* as many placement moves as children in kinship placements," and children in "kinship foster placements are two times more likely than those in stranger foster homes to report positive emotional health."  (*Id.* ¶¶ 148, 152.)

As to M.P. on this point, Plaintiffs allege only that M.P. remains at the Children's Village, a residential treatment center ("RTC"), far away from his home community.  (*Id.* ¶¶ 52,

59.)  Plaintiffs allege that placement in institutional care allegedly "makes M.P. more susceptible to poor school performance, homelessness, arrest, and aging out of ACS custody without a permanent home." (*Id.* ¶ 59.)  As to J.R., Plaintiffs allege that because he has been twice moved to a foster home, he lacks stability and these moves have been disruptive and unsettling. (*Id.* ¶ 92.)  Moreover, J.R. will allegedly transfer to a new school in the middle of 5th grade and this will disrupt the provision of his IEP services. (*Id.*)  With respect to C.P., after he was placed in a foster home, he "regressed significantly," such as having difficulty sleeping. (*Id.* ¶ 110.)

The Court is not unsympathetic to these concerns.  Nor does the Court suggest that these concerns are somehow invalid.  However, they nonetheless suggest that the gravamen of Plaintiffs' complaint is that the Government has not provided a least restrictive, optimal placement, which does not constitute an injury to their right to be free from harm.

Indeed, one need only compare the allegations in this complaint to those in *Marisol*, 929 F. Supp. at 670–71, which was cited by Defendants for the proposition that J.R., C.P. and M.P. fail to allege a cognizable injury to the right to be free from unreasonable intrusions into their emotional well-being because that injury concerns the conditions of foster care, not just the fact that one is in foster care. (Defs.' Mem. at 10.)  There, the plaintiffs are children who all suffered severe abuse and neglect.  *See Marisol*, 929 F. Supp. at 669–71.  For example, one plaintiff entered the foster care system after his mother died from HIV.  *Id.* at 670.  The child was diagnosed with an AIDS-related illness, and was transferred from a diagnostic facility to a group home that lacked the medical staff needed to monitor his condition. (*Id.*)  The Child Welfare Administration of the City of New York ("CWA") neglected to inform the agency of his medical condition.  *Id.*  This plaintiff was then placed in another group home, and CWA again failed to alert the agency of the child's condition. (*Id.*)  When the agency notified CWA that the child

needed hospice care, CWA directed staff to take him to the hospital.  *Id.*  He later died at the age of nineteen.  *Id.*  Another plaintiff was placed at a hospital, diagnostic center and a residential treatment center.  *Id.* at 671.  The child was then approved to be placed with a minister who sexually abused him.  *Id.*  The child ran away.  *Id.*  The child was then returned to the residential treatment center and attempted suicide twice and ran away.  *Id.*  A third plaintiff spent his entire life in foster care, and exhibited violent behavior, including attempting to rape of a nine-year old girl, stabbing other children with pencils and lighting several fires.  *Id.* at 672.  He was then committed to a hospital as a "sexual predator," was placed in a group home and later ran away. *Id.*  CWA failed to locate him.  *Id.*  Against these factual allegations, the district court found that because the custodial plaintiffs adequately alleged that they were deprived of "even adequate or appropriate conditions of foster care including certain basic necessities," and may pursue their substantive due process claims based upon alleged violations of their right to be free from harm. *Marisol*, 929 F. Supp. at 676.  Here, Plaintiffs allegations do not allege the same concerns of abuse, neglect and trauma as reflected in the allegations of plaintiffs in *Marisol*.

Plaintiffs' claim of an injury to the duration and conditions of foster care is a curious one with respect to Plaintiffs M.P., J.R. and C.P.  These Plaintiffs are not complaining that they should not remain in foster care.  Rather, they argue that they should remain in foster care i.e. in state custody, but with a specific relative.  However, the Fourteenth Amendment does not require the state to provide children in foster care with an optimal level of care, but the conditions of confinement must bear a reasonable relationship to the purpose of the custody.  *Marisol*, 929 F. Supp. at 676.  Although Plaintiffs may believe that the optimal level of care is with a specific relative, they are not entitled to this care as the state is not required to provide as much.

Plaintiffs fail to allege how their placement in foster care in any way hinders the purpose of their custody, which in part concerns placement in a healthy family environment.

### B.  Prudential Standing

Prudential standing is a doctrine developed by the Supreme Court under which courts may decline to adjudicate certain categories of cases where Article III's constitutional minimum has been met.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014).  Where a case presents questions of both constitutional and prudential standing, "we may assume Article III standing and address 'the alternative threshold question' of whether a party has prudential standing."  *Phoenix Light SF DAC v. U.S. Bank Nat'l Assoc.*, 2021 WL 4515256, at *2 (2d Cir. Oct. 4, 2021) (summary order).  The prudential standing rule "bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *McCarty v. The Bank of New York Mellon*, 669 F. App'x 6, 7 (2d Cir. 2016) (citation omitted). To satisfy the prudential standing requirement, a plaintiff must assert "his [or her] own legal rights and interests[] and cannot rest his claim to relief on the legal rights or interests of third parties."  *Id.* (citation omitted).  There is, however, an exception to third-party standing, which applies only where a plaintiff can demonstrate "(1) a close relationship to the injured party and (2) a barrier to the injured party's ability to assert its own interests."  *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 109 (2d Cir. 2008).

Here, Defendants argue that Plaintiffs do not qualify for prudential standing because they seek to assert the rights of the Kin Caregivers to be certified or approved as foster parents. (Defs.' Mem. at 14.)  Defendants additionally argue that Plaintiffs do not meet the exception to the third-party standing rule.  (*Id.*)  Plaintiffs respond to Defendants' prudential standing argument in a two-sentence footnote, arguing that the Plaintiff children raise claims based upon

their own rights and injuries they have suffered, not those of the Kin Caregivers.  (Pls.' Opp'n at 4.)

However, as Defendants correctly point out, according to 18 N.Y.C.R.R. § 443.2 and 18 N.Y.C.R.R. § 427.6(b), Kin Caregivers, not the Plaintiff children, have the right to apply for approval as a kinship foster parent and if approved, to receive FCMP benefits.  (Def. Mem. at 14.)  Plaintiffs' claims directly challenge Defendants' alleged unconstitutional disqualification systems and policies, which target the criminal history and backgrounds of Kin Caregivers. Therefore, Plaintiffs' complaint arguably asserts the legal rights and interests on behalf of the Kin Caregivers.

With that said, Plaintiffs have not established that they qualify for the exception to the prudential standing rule.  There is no question that the Kin Caregivers and Plaintiffs have a close relationship through their familial ties.  However, as Defendants argue, Plaintiffs have not demonstrated that there is a hindrance or barrier for the Kin Caregivers to assert their rights in Court and to protect their own interests by challenging Defendants' policies as applied to them. (Defs.' Mem. at 14–15.)  Indeed, Defendants identify examples of cases where relatives, like the Kin Caregivers in this case, have raised challenges to the same or similar disqualification policies.  (*Id.* at 15.)  Plaintiffs do not offer one.  Plaintiffs have not established that there is prudential standing in this case. [6]

---

[6] Even if Plaintiffs had standing to sue, their claims against Governor Hochul would warrant dismissal.  "In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act[.]"  *Ex parte Young*, 209 U.S. 123, 157 (1908).  A state governor does not meet this exception solely "based upon the theory that [s]he, as the executive of the state, was, in a general sense, charged with the execution of all its laws."  *Id*.  Plaintiffs simply allege that "the Governor is required to execute laws and, therefore, is responsible for ensuring that all New York executive departments and agencies, including OCFS and the local departments of social services that OCFS supervises, such as ACS, comply with all applicable federal and state laws."  (Compl. ¶ 133; Defs.' Mem. at 17.) Such bare allegations are insufficient to establish that Governor Hochul had any connection or role in administering the complained of disqualification systems or foster/adoptive parent assessments.  Therefore, the claims against Governor Hochul are dismissed.  *See, e.g.*, *Wang v. Pataki*, 164 F. Supp. 2d 406, 410 (E.D.N.Y. 2001) (dismissing

24

* * *

The truth of the matter is that the disqualification systems Plaintiffs complain of are a workaround that does not address any concerns regarding the safety of the children, but only to deprive them of the money, making children worse off.  Notwithstanding the Court's concern with the viability of the disqualification systems at issue here, Plaintiffs in this case have not established standing.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), and the complaint is dismissed in its entirety.[7]

SO ORDERED.

Dated:  Brooklyn, New York
      September 12, 2023

/s/ LDH_____
LaSHANN DeARCY HALL
United States District Judge

---

plaintiff's claims against the governor because "the general executive duty of the [g]overnor does not provide a basis for a claim against him" and plaintiffs "fail to show that the [g]overnor has any connection with the enforcement of the [statute] other than the general duty to take care that the laws be faithfully executed"); *see also Spiteri v. Russo*, 2013 WL 4806960, *18 (E.D.N.Y. Sept. 7, 2013) (dismissing claims for injunctive relief against Governor Cuomo because plaintiff failed to plead facts demonstrating that he had "direct involvement with [p]laintiff's classification as a sex offender"); *Disability Rights New York v. New York State et al*, 17-CV-6965-RRM-SJB, 2019 WL 2497907, at *18, 23 (E.D.N.Y. June 14, 2019) (dismissing claims against former Governor Cuomo for violations of the ADA and Section 504 of the Rehabilitation Act because plaintiff's allegations did not outline the former Governor's role in these violations and fail to allege how the relief sought could be implemented by the former Governor). Therefore, all claims against Defendant Hochul are dismissed.
[7] Because the Court dismisses Plaintiffs' complaint under Rule 12(b)(1), the Court does not reach Defendants' additional arguments for dismissal under Federal Rules 12(b)(6) and 12(b)(7).